IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG

JILL D. MYERS, as executrix of the
Estate of ELTON C. WINE,

    Plaintiff,

vs.                                      Civil Action No. 1:14-cv-156 (Keeley)

                                          Electronically Filed: September 12, 2014

A.S. TAYLOR, individually, M.S. HORNE, individually, J.C. SAURINO, individually, J. TOMBLYN, individually, S.B. HUFFMAN, individually, M.E. WAGGAMON, individually,

    Defendants.

## COMPLAINT

This complaint, brought pursuant to 42 U.S.C. Section 1983, the Fourth Amendment to the United States Constitution, arises out of the Defendants' use of excessive force and commission of an unreasonable search and seizure on the Plaintiff on or about September 13, 2012 near the town of West Union, Doddridge County, West Virginia, within the Northern District of West Virginia.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1331 and 1343.

## PARTIES

1.    The Plaintiff Jill D. Myers was duly appointed by the County Commission of Doddridge County, West Virginia, on September 21, 2012 as executrix of the Estate of Elton C. Wine, the same being a resident of Doddridge County, West Virginia at the time of his death.

1

2. Defendant A.S. Taylor was at all times relevant hereto a trooper with the West Virginia State Police and was at all times relevant hereto acting under the color of law, having an address of 3453 Monongahela Blvd., Morgantown, West Virginia 26505.

3. Defendant M.S. Horne was at all times relevant hereto a trooper with the West Virginia State Police and was at all times relevant hereto acting under the color of law, having an address of 3453 Monongahela Blvd., Morgantown, West Virginia 26505.

4. Defendant J.C. Saurino was at all times relevant hereto a trooper with the West Virginia State Police and was at all times relevant hereto acting under the color of law, having an address of 3453 Monongahela Blvd., Morgantown, West Virginia 26505.

5. Defendant J. Tomblyn was at all times relevant hereto a trooper with the West Virginia State Police and was at all times relevant hereto acting under the color of law, having an address of 3453 Monongahela Blvd., Morgantown, West Virginia 26505.

6. Defendant S.B. Huffman was at all times relevant hereto a trooper with the West Virginia State Police and was at all times relevant hereto acting under the color of law, having an address of 3453 Monongahela Blvd., Morgantown, West Virginia 26505.

7. Defendant M.E. Waggamon was at all times relevant hereto a trooper with the West Virginia State Police and was at all times relevant hereto acting under the color of law, having an address of Route 2 Box 26, Bridgeport, West Virginia 26330.

## FACTS

8. On September 13, 2012, members of the West Virginia State Police conducted a marijuana eradication operation on the property of John Bowman, in Marion County, West

Virginia. Having found a large number of marijuana plants, they obtained a felony arrest warrant for Mr. Bowman.

9. Several other members of the West Virginia State Police were tasked with locating John Bowman. Mr. Bowman's neighbor told the officers that a man in Doddridge County had previously bonded Mr. Bowman out of jail on prior charges and that he had heard that Mr. Bowman was in Doddridge County with that individual. The officers inquired with the Doddridge County Magistrate Court and discovered that Elton C. Wine had previously bonded Mr. Bowman out and that he was reportedly friends with Bowman.

10. In fact, Elton Wine had hired John Bowman as a farm hand over the years, and had posted his bond previously when he had been arrested. There is no evidence that there was anything inappropriate or illegal about Mr. Wine's prior actions of employing Mr. Bowman, nor in bonding him out. There is no evidence that Mr. Wine was engaged in any illegal activities with Mr. Bowman. Moreover, the arrest warrant for Mr. Bowman had only been issued on September 13, 2012 - the same day - and there is no evidence that Mr. Wine was, or could have been aware, of the issuance of the arrest warrant for Mr. Bowman.

11. The officers then traveled to the residence of Patty Fetty, who is the mother of two of John Bowman's sons. She reportedly told the officers that her sons had spoken on the telephone with Elton Wine the day before and that she had overheard the conversation and allegedly heard John Bowman in the background. Her two sons denied that Mr. Bowman was with Mr. Wine.

12. The officers then obtained a search warrant for Elton Wine's residence "in an attempt to locate Mr. Bowman." Because of Mr. Bowman's criminal history, and due to the

alleged criminal history of Elton Wine, the West Virginia State Police Special Response Team ("SRT"), essentially a SWAT team, had been notified to execute the search warrant and to serve the arrest warrant on Mr. Bowman.  The criminal history of Mr. Wine, which supposedly required use of the SRT was a conviction for transporting marijuana as a truck driver in the 1980's, for which Mr. Wine served 18 months in federal prison.  After he was released from prison, Mr. Wine was a law-abiding citizen for 17 years, with his only criminal charges being a dispute with a neighbor in the mid 1990's which resulted in a misdemeanor assault charge with a $500.00 fine, no jail, and no probation, and a misdemeanor domestic assault charge involving Mr. Wine's then-wife, Jill Myers.  That charge was resolved with a small fine and no jail time.

   13. Shortly after obtaining the search warrant, the SRT, with at least seventeen (17) officers, executed a "no knock" entry into Mr. Wine's residence, breaking through his door with a battering ram.  Before entering the residence, the officers chose not to knock on the door and announce their identity and purpose.  The officers did not request a no-knock warrant from the magistrate in the application for the search warrant.  Nor did their warrant application allege that the execution of the warrant would require a no-knock warrant.  No factual developments occurred between the time the warrant was issued and entry was made so as to create exigent circumstances requiring a no-knock forced entry into Mr. Wine's residence.

   14. At the time of SRT's entry of Mr. Wine's residence, Elton Wine had not been charged with a crime.  Nor was there probable cause to believe that he had committed a crime.

   15. After making entry into Mr. Wine's home, the SRT officers encountered Mr. Wine laying on his couch in the living room.  While shouting, "state police, search warrant," troopers

forcibly handcuffed and detained Mr. Wine at gunpoint while other officers searched the residence.  Mr. Wine told the officers he did not know where Mr. Bowman was located.

16. The SRT officers who detained Mr. Wine used sudden and violent physical force against Mr. Wine, a 71 year old man who was of fragile health, leaving him handcuffed on the floor of his home, with his hands behind his back.  The officers claimed after-the-fact, in their statements, that the 71 year old Mr. Wine resisted them.  However, they also admit that he was to be released upon the completion of the search for Mr. Bowman, even after he allegedly resisted.

17. The force inflicted upon Mr. Wine was severe enough that it left blood spatter from Mr. Wine's body on the walls of the living room and a pool of blood on the couch.

18. While handcuffed and in pain, Mr. Wine began to suffer a medical emergency in response to the force and trauma inflicted upon him.  Mr. Wine requested his inhaler and his oxygen nebulizer.

19. The troopers who handcuffed and used force on Mr. Wine took him into the kitchen of his home and attempted to administer Mr. Wine's oxygen and nebulizer machine.  While administering the nebulizer machine, Mr. Wine was observed to be having continued trouble breathing.  He was not allowed to care for himself due to the fact that he was handcuffed with his hands behind his back.

20. Mr. Wine asked for his handcuffs to be removed.  The troopers who were "assisting" him advised Mr. Wine that the handcuffs would not be removed until the search was complete.

21. After continued difficulty breathing, and while still handcuffed with his hands behind his back, Mr. Wine lost consciousness and began to fall forward towards the floor.  One

officer held Mr. Wine's body upright and held his head up.  The officer then began to "encourage" Mr. Wine to breathe.

22.     A nearby trooper observed Mr. Wine lose consciousness and called 911 from his cell phone.

23.     After Mr. Wine was unresponsive, Defendant Trooper Horne searched for, and located, a handcuff key from another officer, and released Mr. Wine from his handcuffs.

24.     Emergency Medical Technicians arrived approximately 5 to 10 minutes later. They requested that one of the officers administer CPR, which was performed unsuccessfully. Mr. Wine died in his home - which was referred to as a "crime scene" by state police investigators.

25.     Subsequently an autopsy was performed on Mr. Wine by the Office of the Chief Medical Examiner.  Deputy Chief Medical Examiner Allen R. Mock, M.D., concluded that the "circumstances surrounding the death, as determined by the death investigation and post-mortem examination, indicate that the manner of death is best certified as homicide."  He further noted that it is his opinion that Mr. Wine died due to a cardiac arrhythmia while being physically restrained by members of law enforcement in response to the decedent's violent resisting of arrest" and that "[s]anctioned restraint" had been applied by law enforcement.

26.     The medical examiner did not explain his definition of a "sanctioned restraint". Nor did he explain how Mr. Wine could have violently resisted arrest when he was not under arrest.  Thus, the medical examiner concluded that Mr. Wine was a victim of homicide resulting from the actions of police officers.  However, the medical examiner took the extra step of giving his opinion on the legality of the officers' use of force against Mr. Wine, in an apparent attempt

6

at exonerating the involved officers from any potential allegations of misconduct. The physician did not document the information he relied upon in forming his opinions as to the legality of the officers' actions.

27. The autopsy report indicated that there were blunt force injuries to Mr. Wine's body, above and beyond evidence of medical therapy such as CPR. It noted blunt force injuries to the head, torso and extremities. None of the involved officers' statements provide an explanation as to who caused the blunt force injuries to Mr. Wine. Nor do they explain the cause or presence of Mr. Wine's blood splatter on the walls and on the couch. Nor do the officers' statements allege that it was necessary to inflict violent force on Mr. Wine.

28. John Bowman was not found on Elton Wine's property during the search. However, he did show up later while family members were outside Mr. Wine's home following Mr. Wine's death. Family members saw a pickup truck drop off Mr. Bowman at the end of the driveway. They called 911 and reported the presence of Mr. Bowman. Mr. Bowman walked off towards some rental trailers. The family members waited 15-20 minutes. Instead of law enforcement showing up, they received a phone call from the state police, which inquired, "is John still there?" Eventually one police officer arrived, alone, and asked, "where is he?" They pointed towards the trailers. The officer drove to the trailers and took Mr. Bowman into custody without resistance. There was no deployment or involvement of the SRT on that occasion.

29. The troopers who engaged in the initial seizure and use of force against Mr. Wine as described above were Defendant S.B. Huffman and Defendant J.C. Saurino. They were joined shortly afterwards by Defendant A.S. Taylor, Defendant M.S. Horne, and Defendant J. Tomblyn, who were the three officers with Mr. Wine when he became unresponsive. Defendant M.E.

Waggamon was the trooper who obtained, and presided over the execution of, the search warrant for the Elton Wine residence.

## COUNT ONE - EXCESSIVE FORCE UNDER 42 U.S.C. 1983

## VIOLATION OF THE FOURTH AMENDMENT

30. Plaintiff incorporates by reference all the allegations contained in the previous paragraphs.

31. The defendant law enforcement officers, under color of state law, used excessive force against Elton C. Wine, as described above in detail, on September 13, 2012.

32. When the defendant law enforcement officers engaged in inflicting violent physical force against Mr. Wine, causing blunt force trauma, blood loss, pain, and restriction of mobility, no objectively reasonable officers could have perceived Mr. Wine as posing an immediate threat to the safety of the officers or anyone else so as to require the infliction of such violent force.

33. On September 13, 2012, Elton Wine was a frail, 155 pound, 71 year old man who was neither armed, nor reasonably suspected of being armed by the defendants at the time of his violent seizure and detention.

34. At the time violent force was inflicted on Mr. Wine by the defendant officers, he was not charged with any crime. Nor was there probable cause to suspect, or charge, Mr. Wine with the commission of any crime.

35. The defendant officers' actions were objectively unreasonable, unlawful, unwarranted, and in violation of Elton Wine's clearly established procedural and substantive rights, including the Fourth Amendment of the United States Constitution.

36. The said defendants' actions were willful, wanton, intentional, malicious and done with a callous and reckless disregard for Elton Wine's Fourth Amendment right to be free from excessive force. In the event that this Court determines that the use of force against the Mr. Wine occurred at a time when the Mr. Wine was a pretrial detainee, the Plaintiff pleads excessive force, in the alternative, under the Fourteenth Amendment of the United States Constitution.

37. Elton Wine suffered harm, including death, and his estate is entitled to recover damages for the same.

## COUNT TWO - BYSTANDER LIABILITY

38. Plaintiff incorporates by reference all the previous paragraphs.

39. In the event that any of the defendant officers, or other officers, observed, or had reason to know that a constitutional violation was being committed against Mr. Wine on September 13, 2012, and possessed a realistic opportunity to intervene to prevent the harm from occurring to Mr. Wine, and chose not to act, the plaintiff makes a claim against them pursuant to 42 U.S.C. 1983 under <u>Randall v. Prince George's County, Md.</u>, 302 F.3d 188 (4th Cir. 2002).

## COUNT THREE - UNREASONABLE SEARCH AND SEIZURE
## IN VIOLATION OF THE FOURTH AMENDMENT

40. Plaintiff incorporates by reference all the previous paragraphs.

41. Although the defendant officers obtained a search warrant for the home of Elton Wine, they did not seek, or obtain a search warrant authorizing a "no knock" forced entry into Mr. Wine's home. Nor did the officers obtain a search warrant to search, or seize, from Mr. Wine's home anything other than the person of John Bowman.

42. Despite the lack of a search warrant providing for a "no knock" forced entry and/or a search for items of personal property from the Wine residence, the defendant officers, under color of law, conducted a "no knock" forced entry into Mr. Wine's home and seized items of personal property from Mr. Wine's home following his death which occurred in their custody. Numerous items of personal property were seized, including Mr. Wine's wallet and cash found in the wallet. The defendant officers also seized the body of Elton Wine. There was no warrant authorizing the seizure of the body of Elton Wine. However, Mr. Wine's body was listed on the officers' list of seized items and was sent to the medical examiner's office for, what appears to be, a self-serving autopsy report containing language purporting to exonerate the officers' use of physical force against Mr. Wine. It would be readily apparent to any objectively reasonable officer that engaging in these actions would violate the rights of Mr. Wine.

43. Furthermore, the defendant officers exceeded the scope of the search warrant for Mr. Wine's residence in the manner in which the warrant was executed. After the officers determined that John Bowman was not present on the property of Elton Wine, they continued to search the Wine residence, concluding that no additional warrant was necessary. It would be readily apparent to any objectively reasonable officer that engaging in these actions would violate the rights of Mr. Wine.

44. The defendant officers further exceeded the search warrant in the manner in which they seized Mr. Wine after surprising him on the couch of his living room, using an unnecessary, excessive and unreasonable amount of physical force against Mr. Wine, causing blunt force trauma, pain, blood loss, and restrictive mobility. It would be readily apparent to any

objectively reasonable officer that engaging in these actions would violate the rights of Mr. Wine.

45. The defendant officers further exceeded the search warrant in the manner in which they unreasonably kept Mr. Wine handcuffed, with his arms behind his back, during a time in which he was no threat to the officers, was experiencing a medical emergency, was having trouble breathing, and was denied the ability to care for himself. It would be readily apparent to any objectively reasonable officer that removing the handcuffs would not compromise the officers' safety or interfere with the search - especially where Elton Wine undergoing a medical emergency, asking for help, and asking to be released from his handcuffs.

46. The defendants' actions as alleged herein were under color of law, objectively unreasonable, willful, wanton, intentional and done with a callous and reckless disregard for Elton Wine's Fourth Amendment rights to be free from unreasonable search and seizure.

47. Elton Wine suffered harm, including death, and his estate is entitled to recover damages for the same.

## **COUNT FOUR - WRONGFUL DEATH**

48. Plaintiff incorporates by reference all previous paragraphs.

49. As a direct and proximate result of the wrongful acts of the defendant officers, as described above in detail, Elton Wine suffered death by homicide.

50. As a direct and proximate result of the wrongful acts of the defendants officers, as described above in detail, Plaintiff has suffered damages, including, but not limited to: the pre-death pain and suffering of the Decedent; sorrow, mental anguish, and solace, including society, companionship, comfort, guidance, kindly offices and advice of the Decedent; compensation for

the reasonably expected loss of income of Decedent and services, protection, care and assistance provided by the Decedent; expenses for the care, treatment and hospitalization of Decedent incident to the injury resulting in death; and reasonable funeral expenses.

## **PRAYER**

WHEREFORE, based on the above stated facts, the Plaintiff respectfully requests that this Honorable Court award:

1. Damages against the Defendants in an amount to be determined at trial which will fairly and reasonably compensate the Plaintiff for compensatory damages to be proven at trial;

2. Punitive damages against the defendants in an amount to be determined at trial;

3. Reasonable attorney fees and costs;

4. Damages including, but not limited to, the pre-death pain and suffering of the decedent; sorrow, mental anguish, and solace, including society, companionship, comfort, guidance, kindly offices and advice of Decedent; compensation for the reasonably expected loss of income of Decedent and services, protection, care and assistance provided by Decedent; expenses for the care, treatment and hospitalization of Decedent incident to the injury resulting in death; and reasonable funeral expenses.  Plaintiff further prays that she be awarded their costs and attorneys fees herein; and that Plaintiffs be awarded such other relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

                                                JILL D. MYERS, as executrix of
                                                the Estate of ELTON C. WINE,
                                                By Counsel

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEYS AT LAW
611 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

for the Plaintiff

/s Brian K. Carr
Brian K. Carr (WV Bar No. 7139)
712 Sixth Street
P.O. Box 157
St. Marys, WV 26170
(304) 684-9484
Fax: (304)684-9499