# EXHIBIT A

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

3                         AT CLARKSBURG

4

5

6    JILL D. MYERS, as executrix of    :
     the Estate of ELTON C. WINE,      :
7                        Plaintiff     :
                                       :
             v                         :    CIVIL ACTION NO.
8    A.S. TAYLOR, individually,        :    1:14-cv-00156-IMK
     M.S. HORNE, individually,         :
9    J.C. SAURINO, individually,       :
     J. TOMBLYN, individually,         :
10   S.B. HUFFMAN, individually,       :
     M.E. WAGGAMON, individually,      :
11                       Defendants    :

12

13                         *   *   *

14            Deposition of Jason C. Saurino

15               Tuesday, July 14, 2015

16                         *   *   *

17   a defendant herein, taken on behalf of the plaintiff in

18   the above-entitled cause of action, pursuant to notice

19   and the Federal Rules of Civil Procedure, by and before

20   Connie M. Nichols, Registered Professional Reporter and

21   Notary Public within and for the State of West Virginia,

22   at the law offices of Steptoe & Johnson, PLLC, 400 White

23   Oaks Boulevard, Bridgeport, West Virginia 26330,

24

Page 9

1  BY MR. BRYAN:

2      Q.    So the typical practice, in your experience,

3  is to open the door first and then to announce that

4  you're state police?

5              MR. MULLINS:  And you're talking about with

6  the SRT?

7              MR. BRYAN:  I'm talking about as a state

8  trooper.

9      A.    More so with SRT.  Not so much as an

10  investigating officer or a field trooper.  Then, it's

11  typically not the case.

12  BY MR. BRYAN:

13     Q.    So search warrant executions are different,

14  depending on whether you're talking about just a regular

15  field officer, field -- just a non-SRT case as compared

16  to SRT executing a search warrant?

17     A.    Yes, sir.

18     Q.    Okay.

19             With SRT, the typical practice would be to

20  breach or open the door and enter the residence first,

21  prior to announcing that you're state police and that

22  you have a search warrant?

23     A.    I would say it's closer to a three-step

24  process.  The door is breached, announcements, and

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 JASON C SAURINO

Page 20

1    criminal history involving John Bowman and also learned

2    that he was suspected of being at Elton Wine's

3    residence.

4         Q.    Okay.

5               What are mercury switches?

6         A.    It's a switch that could be used in an

7    explosive device.  It's a tube that contains mercury in

8    it, and the movement of the mercury would activate the

9    switch.

10        Q.    Okay.

11        A.    It could be an on/off switch, basically.

12        Q.    It also could be -- they also are found in any

13   number of innocuous items, such as thermostats; is that

14   right?

15        A.    Yes, yes.

16        Q.    Did you also hear or come to possess

17   information that John Bowman had a history of using

18   explosives against police officers?

19        A.    Yes.

20        Q.    And where did you get that information?

21        A.    Just verbally from Lieutenant Reider.

22        Q.    Did you hear that anywhere else?

23        A.    I don't believe I'd ever heard that before.

24        Q.    Specifically, what did he tell you?

Page 23

1    A.    No.

2    Q.    Okay.

3          I mean I didn't see any mention of John Bowman

4    during the newspaper reports.  I mean you really -- are

5    you really making the accusation that John Bowman was

6    involved with the bombing?

7    A.    I certainly believe he could have been.

8    Q.    And that's based on what?

9    A.    His explanation at the deposition of where he

10   supposedly found explosives and his involvement with his

11   brother.  It's just a suspicion.  I certainly couldn't

12   prove it, but then I don't know what deals were made

13   during that time over the investigation.  But it really

14   wasn't -- none of this really applied at the time.  I

15   was just going off information based on -- from

16   Lieutenant Reider, that he had involvement with this

17   explosive device used on a deputy.

18   Q.    You have no evidence that John Bowman was ever

19   involved with any bombing, do you?

20   A.    No.

21   Q.    You never had any evidence that John Bowman

22   was ever involved with any bombing?

23   A.    Just -- again, just the information that I was

24   told that night that he was and that we were acting on.

Page 24

1      Q.    And as we sit here today, you're aware of the

2   fact that John Bowman was not the individual charged in

3   that bombing?  That was his brother, right?

4               MR. MULLINS:  Object to form.

5               You can answer.

6      A.    I don't know what he was charged with during

7   that time or how he was investigated or if any pleas or

8   deals were made during that time.

9   BY MR. BRYAN:

10     Q.    But you don't have any indication that there

11  was, right?

12     A.    Again, I don't know.

13     Q.    I mean all you know is what Lieutenant Reider

14  told you?

15     A.    Correct.

16     Q.    And you never verified that allegation?

17     A.    No.

18     Q.    And I mean you were aware of the fact that at

19  that time John Bowman was wanted for growing marijuana,

20  right?

21     A.    Correct.

22     Q.    He wasn't wanted for any sort of violent

23  crime, right?

24     A.    No.

Page 25

1     Q.     You've also stated that Lieutenant Reider told

2     you that the last time officers went to arrest John

3     Bowman, he had taken his family hostage?

4     A.     Yes.

5     Q.     Do you have any evidence that that is true?

6     A.     That is -- again, it's just what I've been

7     told, just like the explosive.

8     Q.     Okay.

9            When Lieutenant Reider was telling you these

10    things, was this in person or over the phone?

11    A.     Initially, over the phone, and then I met him

12    in person.

13    Q.     Where did that take place?

14    A.     At the Bridgeport state police office in

15    Harrison County.

16    Q.     So was that still the same day that John

17    Bowman's -- that the marijuana had been found at John

18    Bowman's residence?

19    A.     I don't recall if -- I believe it was -- I

20    don't know if that was exactly the same day.  I believe

21    it was that morning, but I'm just going from memory.

22    Q.     So this was a marijuana eradication effort?

23    A.     That was my understanding.

24    Q.     So it was basically where they fly the

Page 26

1    helicopter around and just look for people growing

2    marijuana?

3        A.    Yes, sir.

4        Q.    And they evidently spotted some at John

5    Bowman's residence and moved in to check it out and

6    found some marijuana; is that right?

7        A.    That was my understanding.

8        Q.    And they issued an arrest warrant thereafter

9    for John Bowman?

10       A.    Yes, sir.

11       Q.    And began to look for him?

12       A.    Yes, sir.

13       Q.    So this wasn't somebody who had been some

14   wanted fugitive for a number of days or weeks?

15                   MR. MULLINS:  Object to form.

16   BY MR. BRYAN:

17       Q.    Is that right?

18       A.    I believe it was within a short amount of

19   time.  But it was my understanding that he was aware

20   that he was a wanted fugitive and that he was evading

21   law enforcement.

22       Q.    And how did you know that?

23       A.    That was what was told to me.

24       Q.    By Lieutenant Reider?

Page 27

1    A.    Yes, sir.

2    Q.    Did you learn anything else from

3  Lieutenant Reider?

4    A.    Yes, sir.  Just the additional criminal

5  history of his wanton endangerment, malicious assault,

6  the obstructing and other violent charges, as well as

7  that he was facing a possible severe penalty for this

8  from his previous criminal history and the amount of

9  dope that was seized.

10    Q.    Did you learn anything about Elton Wine at

11  this time?

12    A.    Yes, sir.  I also learned that Elton Wine was

13  involved and that he was suspected of being -- harboring

14  John Bowman, and that they had a pretty, you know --

15  they had a working relationship together, and that

16  might -- the question initially was if we could go

17  through Elton Wine to try to get John Bowman.  Would he

18  cooperate with us?

19        And it was made very clear that he would not

20  cooperate with the state police and that that wasn't an

21  option for us to try to pursue to see if we could do

22  that.

23    Q.    That was made clear by who?

24    A.    The -- Lieutenant Reider.  And I was also

Page 28

1    speaking with First Sergeant Randy Monroe, and

2    Corporal Steve Swiger was also involved.  So I met with

3    all three, so they were all giving me information on

4    this case.  So I can't actually say specifically who

5    told me what.

6        Q.    So your initial thought was to contact Elton

7    Wine?

8        A.    Yes.

9        Q.    But they said, "No"?

10       A.    Well, they said he -- we would basically be --

11   their familiarity with him and his criminal history was

12   that he would not be cooperative with us, so we would be

13   compromising our location of John Bowman by trying to

14   talk with Elton Wine.

15       Q.    So I mean were they taking the position that

16   anyone with any criminal history will be uncooperative

17   with the state police?

18       A.    I don't know what their position was.  It was

19   just that that's what --

20       Q.    So they didn't explain it to you?

21       A.    That was the information that they -- I think

22   they said their familiarity with him and probably

23   Trooper Waggamon's familiarity with him.  People who

24   have dealt with Elton Wine didn't believe he would

Page 29

1    cooperate with law enforcement and that he would be

2    likely to tell John Bowman, who would be able to walk

3    away freely.

4        Q.    Were you provided with any documentation, or

5    was all of this verbal?

6        A.    It was verbal, until I arrived at the

7    Bridgeport detachment, and then I was provided some

8    documentation on the location of the residence on the --

9    I was given a driver's history of John Bowman that had

10   his picture, and I was provided with the arrest warrant

11   for John Bowman.

12       Q.    At this time, was there a search warrant

13   already for the Wine residence?

14       A.    No, sir.  It was in the process of being

15   obtained.

16       Q.    Okay.

17             So who was going to obtain that?

18       A.    Corporal Waggamon.

19       Q.    Was he there at this time?

20       A.    No, he was obtaining the search warrant.

21       Q.    And who asked him to do that?  Do you know?

22       A.    I'm not sure.

23       Q.    So what happened next?

24       A.    So I began to put my notes together for a

Page 30

1    briefing about our plan of operation.  And I notified

2    the team members and requested they respond to the state

3    police detachment, and began to ready a briefing and a

4    plan of operation to attempt to secure Mr. Bowman.

5         Q.    And was it explained to you at that time why

6    they believed that Bowman may be at the Wine residence?

7         A.    At the time, I believe that there was a third

8    party.  I can't remember if I knew the relationship at

9    the time.  I do now, but they contacted law enforcement

10   and said that they heard John Bowman at the residence

11   and had reasonable suspicion to believe that he was

12   still there.

13        Q.    At some point, did you have -- did you brief

14   the other SRT team members?

15        A.    Yes, sir.

16        Q.    And tell me about that.

17        A.    When everyone arrived, I basically used

18   military operation order format.  I just gave the

19   purpose for what we were there for, to locate

20   Mr. Bowman, and the residence that he was being harbored

21   at and the situation with the persons involved, which

22   was Mr. Bowman and Mr. Wine.

23             And I gave the information about their

24   criminal histories and gave information that I learned

Page 33

1   had notified Elton Wine about John Bowman being wanted

2   for arrest?

3       A.      No.

4       Q.      It was your understanding that nobody from law

5   enforcement had asked Elton Wine if he knew the

6   whereabouts of John Bowman?

7       A.      No.

8       Q.      In fact, law enforcement was assuming that

9   Elton Wine was engaging in criminal behavior and

10  harboring John Bowman?

11      A.      That appeared to be the suspicion that was

12  passed to me.

13      Q.      So as far as you knew, there wasn't -- strike

14  that.

15              All right.

16              So following the briefing, what happened?

17      A.      We donned our protective gear and began to

18  travel on route to the residence there, Elton Wine's

19  residence.

20      Q.      And what happened once you got there?

21      A.      We exited the vehicle.  We stopped about

22  400 yards short, based on the layout and the open area.

23  There was also suspected to be a fence, so we didn't

24  want to try to drive in, come across a fence and have to

Page 34

1    try to -- basically, we'd be compromised.  So we made

2    the decision to walk towards the residence and make

3    entry of the residence.

4        Q.    Did you have photographs of the Wine residence

5    prior to going?

6        A.    Like a Google Maps photograph.  I don't know

7    if it was specifically Google, but it was an aerial

8    picture.

9        Q.    So you guys approached by foot?

10       A.    Yes, sir.

11       Q.    It was dark outside?

12       A.    Yes.

13       Q.    Was the search warrant approved prior to

14   leaving for the residence?

15       A.    My understanding is that it had been signed

16   before we left the detachment and that Corporal Waggamon

17   would meet us out near the residence.

18       Q.    Okay.

19             And did Corporal Waggamon meet you there?

20       A.    We -- yes, sir.  Yes, sir, he was out there,

21   not as part of our operation but as the investigating

22   officer.

23       Q.    Okay.

24             What happened as you guys approached the

Page 35

1   residence?

2       A.     We were -- again, we were walking on foot

3   towards the residence.  Dogs started barking, which gave

4   me some concern as to whether we were compromised or

5   not.  Part of our element broke off.  Sergeant Curran,

6   Trooper Whetzel and Trooper Anderson and the K-9, Ike,

7   went towards the back of the residence to the cover the

8   perimeter security, rear security, and the rest of the

9   element approached on the porch.  I heard

10  Sergeant Huffman call for a breach.  Trooper Taylor

11  breached the door, and the team made entry.

12          The first voice I remember hearing was

13  Sergeant Huffman.  I believe he said something to the

14  effect of, "State police.  Put your hands on your head."

15  I heard other members as they entered, echoing, "State

16  police.  Search warrant."

17          We cleared the house.  I encountered another

18  locked door towards the rear of the residence.  I called

19  for a breach.  Trooper Taylor broke that door for me.

20  We went in and found an unoccupied bedroom.

21      Q.     Was the decision made before you got there to

22  breach the door prior to announcing your presence?

23      A.     Yes.

24      Q.     Or was that a decision that was made on the

Page 37

1    other than that, I'm pretty well very last.

2        Q.    Okay.

3              Did you not have a medic?

4        A.    No, we didn't that night.

5        Q.    Why not?

6        A.    He was deployed in the military, I believe.

7        Q.    Okay.

8              So you guys walk up to the door.

9    Sergeant Huffman was first in the lead; is that right?

10       A.    Yes.

11       Q.    And then he called for the breach?

12       A.    Yes.

13       Q.    So do you know whether he tested the door to

14   see if it was locked or not?

15       A.    That's standard practice, but I didn't see

16   exactly.

17       Q.    All you did -- you just heard him call for a

18   breach?

19       A.    Yes, sir.

20       Q.    Okay.

21             And then Trooper Taylor brought his ram to the

22   door?

23       A.    Yes, sir.

24       Q.    And the next thing that happened was that he

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 JASON C SAURINO

Page 38

1    busted through the door?

2        A.    Door breaks, and I hear Sergeant Huffman

3    announcing.

4        Q.    And did he walk through the doorway before

5    announcing?

6        A.    It's announce as the entry is made.  Like I

7    said, it's a three-step process.  It would be door break

8    and announcements as you enter.  Now, that's a very -- I

9    understand that's a very narrow time frame when all that

10   happens, but that's the order.

11       Q.    Okay.

12             So what happened next?

13       A.    Basically, what I explained was that we went

14   through the house.  I saw Sergeant Huffman with

15   Mr. Wine.  I went through and encountered the locked

16   door to the rear of the residence.

17       Q.    What did you hear Sergeant Huffman say to

18   Mr. Wine?

19       A.    I heard him say, "Place your hands on your

20   head," and announcing, "State police."

21       Q.    Okay.

22             Did you personally observe Elton Wine?

23       A.    Yes.

24       Q.    And where was he when you saw him?

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 JASON C SAURINO

Page 39

1    A.    On the couch, in what I'd call the middle
2    living room area.
3    Q.    Was there a TV on?
4    A.    I believe so.
5    Q.    So it appeared to you that he was sitting on
6    his couch, watching TV?
7    A.    Yes.
8    Q.    Did he appear to have been surprised?
9    A.    I wouldn't say I saw that well.  It'd probably
10   be more peripherally as I was going back towards the
11   rear of the residence.
12   Q.    Did you hear Elton Wine say anything at that
13   time?
14   A.    I don't remember.
15   Q.    So you ran towards the rear of the residence
16   and requested another door breach?
17   A.    Yes, sir.  I passed -- there was a -- it
18   seemed like there was a kitchen on the left and the door
19   on the right.  And I went to clear that door, but it was
20   locked.  So, yeah, I called for another breach.
21   Q.    Okay.
22         What happened next?
23   A.    That door was breached, and we went and
24   cleared that room.  And there was no one in there.

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 JASON C SAURINO

Page 40

1      Q.     And John Bowman was not found in the house,

2    correct?

3      A.     No.

4      Q.     Did you find any evidence that John Bowman had

5    been in the house since he was a fugitive?

6      A.     There was a -- I believe there was a bedroll

7    found in one of the rear outbuildings between three

8    other residences.  We entered the door of the

9    outbuilding behind it, and a bedroll was found.

10     Q.     And you heard the -- you were here for the

11   deposition of Elton Wine's daughter, correct?

12     A.     No, sir.

13     Q.     You weren't here for that?

14     A.     Just for Mr. Bowman and his children, I

15   believe.

16     Q.     I believe she has said that that was hers.

17   That's where she slept sometimes.  But you don't have --

18   in any event, you don't have any evidence that -- tying

19   that bedroll to John Bowman, do you?

20     A.     Just circumstantial.

21     Q.     Well, I mean a lot of people would have

22   bedrolls at their residence and are not harboring

23   fugitives, right?

24     A.     That was kind of actually unusual to see.

Page 41

1      Q.     Why is that?

2      A.     A bedroll lying out.  With all the other

3   circumstances, that we would find a bedroll in an

4   outbuilding where he was suspected of hiding.  It seemed

5   kind of consistent with that activity, to me.

6      Q.     Other than the bedroll, did you find any of

7   John Bowman's belongings along with it or evidence that

8   he had been there?

9      A.     I wouldn't have been aware if it was or

10   wasn't.

11      Q.     Other than the bedroll, do you have any

12   evidence that John Bowman had been there?

13            MR. MULLINS:  That's not in the information

14   he was given beforehand.  I mean you're asking if he

15   found any evidence after he got there?

16            MR. BRYAN:  Yeah.

17      A.     At the house, I wouldn't know.  I mean there

18   was nothing like a suitcase with his name on it or

19   anything like that.

20   BY MR. BRYAN:

21      Q.     Well, when you guys got there in the dark, you

22   surrounded the house in silence, right?

23      A.     We -- yes, sir.  We kind of split off.  One

24   went to the front.  One went to the back door.  One

ca3c87b1-9025-4485-8718-606073f668a4

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 JASON C SAURINO

Page 43

1     Q.     And what did you observe there?

2     A.     Just a belligerent Elton Wine that was

3  refusing to cooperate with Sergeant Huffman.  I saw him

4  pulling away.  And then Sergeant Huffman went to secure

5  him.  By my observation, it appeared -- I saw a very

6  defiant and aggressive Elton Wine that was doing

7  everything to stop Sergeant Huffman from taking him in

8  peacefully and securing him.

9     Q.     Okay.

10         So he was going to be handcuffed regardless of

11  his behavior, right?

12     A.     That's normal policy.  We go in and secure

13  everyone to protect from any kind of threat.  There are

14  some circumstances where not everyone is handcuffed.

15  Sometimes we come across a child or something like that

16  in a residence.  But it's most of the time.  Everyone in

17  this particular case, definitely.  Both John Bowman and

18  Elton Wine would have been.  I would've expected them to

19  be secured until we could finish clearing everything.

20     Q.     Okay.

21         So except for a child maybe, anyone in the

22  residence that you find is going to be handcuffed during

23  the search, as a practice?

24     A.     As a practice, they're all -- you've got to

Page 47

1    down to the floor from the couch?

2        A.    Yes.

3        Q.    Did you see Sergeant Huffman handcuff

4    Mr. Wine?

5        A.    Yes.

6        Q.    Did you observe him strike Mr. Wine at all?

7        A.    No.

8        Q.    Did you observe any pain-compliance

9    techniques?

10       A.    Basically, a wristlock to try to get him to

11   remove his hand that was tucked under his body.

12       Q.    So it would've been a wristlock on his right

13   hand?  Do you recall?

14       A.    I don't recall exactly.

15       Q.    What is a wristlock?

16       A.    It's a joint manipulation to try to gain

17   compliance.  It's basically a hands-on force to get them

18   secure so that they can be handcuffed.

19       Q.    Do you recall whether Mr. Wine was injured as

20   a result of any uses of force by Sergeant Huffman?

21       A.    I remember that as he was securing him and he

22   went to the ground, there was a table offset from the

23   couch.  And there was glass on that table, and it

24   shattered and broke on the ground.  So there was -- I

Page 48

1    mean, again, Mr. Wine was apparently doing everything he

2    could to resist being handcuffed.  He was swinging arms,

3    moving out, keeping his hand under -- keeping his arm

4    underneath him.

5        Q.    Was this before you asked him where John

6    Bowman was?

7        A.    Yes.

8        Q.    Okay.

9              Do you recall seeing any blood?

10       A.    I'm sure I was in a position to be there to

11   see it, but I don't really recall it.

12       Q.    What broke the furniture or broke the glass?

13       A.    I wouldn't know what hit it.  I believe it was

14   just their bodies, and then that process of taking him

15   down and him kicking out and fighting that made it get

16   knocked over.  But I didn't see specifically what hit

17   the table or if it was even Sergeant Huffman moving to

18   the side to -- if he bumped it.  I have no idea what

19   knocked that over.

20       Q.    Okay.

21             What happened next?

22       A.    We were securing the residence, and I remember

23   seeing Matt Horne come out and his -- he looked

24   panicked, to me, and asked for a handcuff key.  And I

Page 49

1    took that to mean that there was a problem.  He didn't

2    articulate it, but it seemed to me like there was some

3    sort of medical emergency going on with Mr. Wine at that

4    time.  So I -- we got him a handcuff key.

5            I asked Sergeant Tomblyn, Josh, to -- having

6    known that Josh had been a paramedic, I asked him to go

7    in and give them some assistance.

8            And I also radioed Lieutenant Reider and asked

9    that -- and told him that it was clear for them to come

10   to the scene and to request that EMS respond as well.

11   We had EMS staged down the road.

12       Q.   But how long was that after the time that you

13   left Mr. Wine?

14       A.   I can't say exactly.  I would guess within a

15   couple minutes.

16       Q.   Where was Lieutenant Reider at this time?

17       A.   I don't know exactly, but they were -- they

18   were staged down the road from us, the road we used to

19   approach towards the residence.  They would've been

20   behind our van a little farther down the road.  We

21   passed EMS when we went there, and then they staged

22   nearby.  But I'm not sure exactly where.

23       Q.   So who called EMS?

24       A.   I couldn't say exactly.  I requested that of

Page 50

1    Lieutenant Reider.   And then I know that EMS came a

2    short time later.

3         Q.    Did you go back in to see Elton Wine?

4         A.    No, sir.

5         Q.    Why not?

6         A.    We were -- as far as entry, we were complete

7    at that time.

8         Q.    So you basically turned the scene over to

9    the -- to Lieutenant Reider?

10        A.    Investigators and EMS there.

11        Q.    Did you ever observe Elton Wine assault or

12   attack or attempt to attack any police officer that

13   night?

14        A.    No, sir.

15        Q.    Did you ever see him grab anybody's gun?

16        A.    No, I didn't see that.

17        Q.    Other than hearing Elton Wine tell you

18   something to the effect that he didn't know where John

19   Bowman was, do you recall any specific words that Elton

20   Wine said that night?

21        A.    Just that -- I just remember his -- I don't

22   remember the exact words, but he was being belligerent

23   and apparently doing everything he could to resist

24   cooperation with Sergeant Huffman.   And his actions were

Page 55

1    But it didn't save his life.

2        Q.    They didn't unhandcuff him, right?

3        A.    Well, initially, no.

4        Q.    Well, they didn't unhandcuff him during pretty

5    much all of his medical difficulties, according to the

6    testimony we've heard.

7        A.    It sounds like they didn't when he was talking

8    and being belligerent with them.  No, they didn't

9    unhandcuff him.  But when he started having a medical

10   emergency, they did at least what they could perceive.

11       Q.    And you weren't there for any of that when

12   that took place, right?

13       A.    No, I just based it off the testimony we just

14   heard.

15       Q.    Okay.

16             But you're -- as the team leader, you're okay

17   with them not releasing the handcuffs when Mr. Wine

18   asked that they be released so that he could breathe and

19   care for himself?

20       A.    With what they explained was going on at the

21   time, I support their decision.  I wasn't there to read

22   his actions.  I couldn't make that call.  But with what

23   they explained, it didn't sound like they recognized any

24   distress.  As soon as they recognized distress, they

ca3c87b1-9025-4485-8718-606073f668a4

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 JASON C SAURINO

Page 59

1    Q.    And tell me what kind of factors you look at
2    to make that decision.
3    A.    We look at the history of the person involved.
4    We look at the gravity of the situation, whether it's --
5    how serious is the warrant, how serious is the
6    situation, whether it be an active shooter, you know,
7    all the way down to maybe a misdemeanor offense.  We
8    look at the presence of weapons, the number of people
9    involved, the location of the area.  And I would say
10   those are some of the major factors.  I'm probably
11   forgetting a thing or two.
12   Q.    Is it kind of the totality of the
13   circumstances and the factors that would indicate to you
14   whether or not there would be a danger to the team -- or
15   trooper, if somebody tried to the execute the warrant
16   without the team?
17   A.    Yes, sir.  It's basically a hierarchy of life.
18   We place, of course, innocent people or the citizens and
19   then the troopers and then SRT is -- we place ourselves
20   before the -- we would basically lay down our lives
21   before the troopers to try to protect them.  So we want
22   to keep as many people safe as we can.  So if it seems
23   like it would be dangerous for a regular trooper to
24   execute that warrant, then we'll put ourselves in harm's

Page 62

1    history, everything they've been charged and recorded

2    for.  It doesn't mean there aren't other charges that

3    exist, but the charges that have been taken in and

4    processed properly and that have fingerprints taken with

5    them go to the III/CIB.

6        Q.    John Bowman, according to his III, had been

7    arrested for assault, domestic assault, domestic

8    battery, grand larceny, unlawful wounding, domestic

9    battery again, possession with intent to distribute,

10   unlawful taking of a vehicle, battery, another battery,

11   obstruction of an officer, obstruction of property,

12   another battery, another battery, trespassing structure

13   or conveyance, another battery, destruction of property,

14   malicious assault, malicious wounding, another charge of

15   malicious assault and malicious wounding.

16            Are those the kinds of factors that would

17   weigh on your mind in determination of whether or not

18   you would use the SRT?

19       A.    Yes, sir.

20       Q.    And Mr. Bowman testified that he was also

21   convicted of being a felon in possession of a firearm.

22   Do you recall -- you were at his testimony, right?

23       A.    Yes, that's correct.

24       Q.    And that was information you were given prior

Page 63

1    to the execution of this warrant as well, right?

2        A.    Yes, sir.

3        Q.    And so if somebody has a history of violent

4    crimes, has been convicted of a felony and then even

5    after they were convicted of a felony gets convicted of

6    being in possession of a firearm when they are not

7    allowed to be, those are the types of factors you'd

8    consider in utilizing the SRT, right?

9        A.    Yes, sir.  And in that particular case, too,

10   coupled with the ammunition that was found at his

11   residence and no firearm, made me concerned that he was

12   in possession of those firearms.

13       Q.    There was a search warrant executed on John

14   Bowman's house well before the search warrant on

15   Mr. Wine's house, right?

16       A.    Yes, sir.

17       Q.    And there were bullets found in his house but

18   no gun, right?

19       A.    Correct.

20       Q.    And you couple that with all the violent

21   crimes that he's been charged with or convicted of, and

22   being a felon in possession, and having this

23   overhanging, current, new charge of growing a large

24   amount of marijuana, and those are factors that the

Page 64

1    SRT -- that you'd want to consider as an SRT member,

2    right?

3         A.    Yes, sir.

4         Q.    And you also had looked -- you also had other

5    information beyond the III that had been provided to you

6    by the investigating officers, too, right?

7         A.    Yes, sir.

8         Q.    About John Bowman's history that these

9    officers in the area knew from word of mouth, right?

10        A.    Correct.

11        Q.    And you evaluated and took that into

12   consideration, too, correct?

13        A.    Yes, sir.

14        Q.    And then Elton Wine -- you were in possession

15   of his criminal history as well, right?

16        A.    Yes, sir.

17        Q.    Through his III, right?

18        A.    Yes, sir.  Told that information.

19        Q.    And he had been convicted of domestic battery?

20        A.    Yes, sir.

21        Q.    And assault, a brandishing.

22              What does "brandishing" mean to you?

23        A.    It means that he pulled a weapon on another

24   person in some type of threatening manner.

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 JASON C SAURINO

Page 65

1    Q.    And he had been convicted of that according to

2  his III as well, right?

3    A.    Yes, sir.

4          And, specifically, a firearm on brandishing.

5    Q.    And those kinds of factors -- they would be

6  something that you would consider in this situation

7  where you're going into Elton Wine's house to look for

8  John Bowman?

9    A.    Correct.

10          MR. MULLINS:  That's all the questions I

11  have.

12                    *   *   *

13              E X A M I N A T I O N

14  BY MR. BRYAN:

15    Q.    All these things that your attorney listed,

16  John Bowman's criminal history, Elton Wine's criminal

17  history, the result of the search of the Bowman

18  residence -- you knew all of these things.  All of these

19  things were known prior to the application of the search

20  warrant for the Elton Wine residence, right?

21    A.    That's correct.

22    Q.    So if the situation was legitimately so

23  dangerous that there should be no-knock and announce

24  made, this could have been presented to the magistrate

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 JASON C SAURINO

Page 72

```
1   THE STATE OF      :
    WEST VIRGINIA     :
2                     : SS:  C E R T I F I C A T E
    COUNTY OF OHIO    :
3

4
             I, CONNIE M. NICHOLS, Notary Public within and
5   for the State of West Virginia, duly commissioned and
    qualified, do hereby certify that the within-named
6   witness, JASON C. SAURINO, was by me duly sworn to
    testify to the truth, the whole truth and nothing but
7   the truth in the cause aforesaid.

8
             I do further certify that I am not a relative,
9   counsel or attorney of either party, or otherwise
    interested in the event of this action.
10

11           I further certify that the reading and signing
    of the transcript was requested.
12

13           IN WITNESS THEREOF, I have hereunto set my
    hand and affixed my seal of office at Wheeling,
14  West Virginia, on the 27th day of July 2015.

15

16

17           Connie M. Nichols
             CONNIE M. NICHOLS, Notary Public
18           within and for the State of
             West Virginia
19

20
    My Commission expires:
21  October 16, 2016

22

23

24
```

Statement of Sergeant Jason C. Saurino of the West Virginia State Police Special Operations written on Sunday, September 16, 2012 at approximately 1600 hours at the WVSP Morgantown Detachment.

On Thursday, September 13, 2012 at approximately 1850 hours, this officer received a telephone call from Lieutenant Reider, Executive Officer of the West Virginia State Police Troop 1 Headquarters, advising that a search warrant was being obtained for a residence in Doddridge County for the suspect, John W. Bowman and Lt. Reider was requesting that our Special Response Team be activated for the execution of the search warrant. This officer had earlier spoke by telephone with Captain Merrill, Lt. Reider and First Sergeant Monroe concerning John Bowman and had learned that John Bowman was suspected of cultivating a large amount of marijuana and that he was currently a fugitive believed to be hiding at the residence of Eldon Wine of Doddridge County. This officer learned from Lt. Reider that John Bowman had an extensive criminal history to include but not limited to: criminal conspiracy to use explosives that resulted in serious injury to an officer, firearms violations, assault, domestic assault, domestic battery, obstructing an officer, wanton endangerment and malicious assault. Lt. Reider stated that the last time officers went to arrest John Bowman; he had taken his family hostage. This officer also learned from Lt. Reider that a search warrant had been executed at the Bowman residence and officers discovered numerous mercury switches (possibly used in manufacturing improvised explosive devices) as well as ammunition for a .308 caliber rifle and 12 gauge ammunition for a shotgun leaving this officer to believe that the suspect was in possession of one or both of these firearms. This officer learned that John Bowman had recently served time in Federal Prison and was likely to face up to life for the cultivation warrant that was currently a fugitive for. This officer had also learned that the homeowner that was concealing John Bowman was not likely to cooperate with authorities and also had an extensive criminal history to include but not limited to: convicted felon in possession of firearms, brandishing, possession of cocaine, assault and battery.

On this same date, at approximately 1900 hours, this officer notified SRT Alpha members: Sgt. J. Tomblyn, Sgt. W. J. Curran II, TFC G. S. DeWeese, TFC R. J. Busick, TFC A. S. Taylor and TFC M. S. Horne and requested they respond to the WVSP Bridgeport office for an SRT call-out. This officer then notified Sgt. S. B. Huffman, SRT Charlie Team Leader, and requested that he and any of his local team members respond as well. Sgt. Huffman called this officer back a few minutes later and stated that TFC M. M. Massie and Sr. Tpr. T. S. Perry would be responding to the Bridgeport Detachment as well. This officer then notified K-9 handler C. D. Whetzel of the WVSP and requested that he contact sniper support for perimeter security and that they respond to the Bridgeport Detachment. TFC Whetzel telephoned this officer back a short time later and advised that TFC R. D. Anderson would be responding for sniper and perimeter support. This officer then telephoned 1/SGT Arthur, Executive Officer of the West Virginia State Police Special Operations, explained the situation and requested approval for the operation. 1/SGT Arthur approved the utilization of SRT members and advised he would contact Cpt. Stonestreet, our commander of Special Operations.



EXHIBIT 1
WIT: Saurino
DATE: 7/7/15
C. M. NICHOLS, REPORTER

WVSP000033

On this same date, at approximately 2030 hours, this officer arrived at the WVSP Bridgeport Detachment and met with Lt. Reider, 1/SGT Monroe, 1/SGT Tierney, Cpl. Swiger and Cpl. Waggamon. This officer was provided a driver history with photograph of the suspect, John Bowman, a copy of the arrest warrant for John Bowman and copies of photographs of the residence the suspect was believed to be hiding at. This officer learned that Cpl. Waggamon would be requesting approval for the search warrant by a Magistrate and would advise if and when the search warrant was approved. This officer then began working on an operations plan while waiting for SRT members to arrive.

On this same date, at approximately 2115 hours, this officer briefed all team members on the particulars of the operation. Due to a long clear driveway approach and the belief that there was a fence along the driveway, this officer chose for SRT members to make an approach by foot while it was still night to try to best insure the safety of the operation by limiting the amount of time the suspect could become armed or escape from the residence. Investigating Officers would stage along Route 23 and respond at the time the residence was secure. This officer requested that EMS be notified that an operation would be conducted in the area and that they be on standby. This officer learned from Cpl. Swiger that the search warrant had been approved and that Cpl. Waggamon would meet near the area where the search warrant was to be executed. SRT members donned their protective vests and gear with the identifying labels of the State Police.

On this same date, at approximately 2150 hours, SRT members loaded in SRT Alpha's van and Cpl. Swiger drove the towards the residence from the Bridgeport Detachment. The drive took approximately 45 to 50 minutes. Cpl. Swiger stopped approximately 400 yards from the residence and identified the residence to this officer. SRT members then exited on foot and approached the residence without incident. The entry team approached to front door of the residence while the K-9 support team went towards the rear of the residence. This officer heard Sgt. Huffman call for a "breach" or forced entry of the door and this officer observed TFC Taylor move forward with the ram. Forced entry was then made through the front door and this officer heard Sgt. Huffman immediately call, "State Police, put your hands on your head!" This officer heard several members echo the command of "State Police, Search Warrant!" as members entered the residence. As this officer passed through the residence this officer observed a man, later identified as Eldon Wine, sitting on a couch that Sgt. Huffman was giving verbal direction to. This officer encountered a locked door towards the rear of the residence and requested an interior breach. TFC Taylor utilized a ram to force the door and this officer made entry into a bedroom and discovered the room was empty. This officer then came back to the room where Mr. Wine was and asked him where John Bowman was. Mr. Wine advised that he did not know. This officer observed Sgt. Huffman "go cold" meaning he secured his weapon while covered by TFC Busick, then attempted to secure Mr. Wine for Mr. Wine's safety and the safety of the team. This officer observed Mr. Wine was obviously not compliant with Sgt. Huffman's verbal requests and was pulling away from him, then

*Sgt. J C Brunner*

WVSP000034

tucking his arm under his body as he went prone on the floor creating a potentially dangerous situation for himself and the team as SRT members did not know if he was armed and reaching for a weapon. This officer observed Sgt. Huffman utilized a wrist lock on Mr. Wine which brought compliance by Mr. Wine and Mr. Wine was able to be handcuffed for officer safety. This officer then heard Sgt. Huffman ask for someone to get Mr. Wine's inhaler at which time TFC Horne was able to locate and provide the inhaler. Mr. Wine was then escorted to a chair in the neighboring kitchen and this officer requested that TFC Horne and TFC Taylor stay with the suspect. This officer then directed the rest of the team to search several outbuildings in the curtilage of the search warrant and this officer exited the residence with the remainder of the team. Upon meeting with the perimeter team, this officer learned from Sgt. Curran that there was a pillow and a bedroll in a barn at the rear of the residence that had appeared to be recently used. This officer radioed Lt. Reider and advised that we had one in custody; however, the primary suspect had not yet been located and SRT members would begin searching the outbuildings. Prior to securing the neighboring garage, this officer observed TFC Horne exit the residence and request a handcuff key. This officer believed from his since of urgency that Mr. Wine was experiencing a medical emergency. This officer requested that Sgt. Tomblyn, having previous experience as a Paramedic, assist TFC Horne with Mr. Wine. This officer then radioed Lt. Reider and requested that the investigating officers come to the scene and that EMS respond for Mr. Wine. This officer then cleared the remaining outbuildings with SRT members with no contact with the suspect, John Bowman. Control of the scene and investigation was turned over to the investigating members upon their arrival.

Sgt. JC Sammons

WVSP000035