# EXHIBIT L

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

3                        AT CLARKSBURG

4

5    JILL D. MYERS, as Executrix        :
     of the Estate of ELTON C. WINE,    :CIVIL ACTION NO.
6                        Plaintiff      :   1:14-cv-156
                 v                      :
7    A.S. TAYLOR, Individually; M.S. HORNE, :
     Individually; J.C. SAURINO,        :
8    Individually; J. TOMBLYN, Individually;:
     S.B. HUFFMAN, Individually;        :
9    M.E. WAGGAMON, Individually,       :
                     Defendants.        :

10

11                      *   *   *

12               Deposition of Lillian Wine

13                 Thursday, June 18, 2015

14                      *   *   *

15

16   a witness herein, taken on behalf of the defendants in

17   the above-entitled cause of action pursuant to notice

18   and the Federal Rules of Civil Procedure by and before

19   Debra A. Volk, Professional Court Reporter and Notary

20   Public within and for the State of West Virginia at the

21   offices of Steptoe & Johnson, PLLC, 400 White Oaks

22   Boulevard, Bridgeport, West Virginia 26330, commencing

23   at 2:20 p.m.

24

Page 10

1   A.      Yes.

2   Q.      Okay.

3   A.      I have another paper somewhere, about his wallet

4   and stuff.

5   Q.      Okay.

6   A.      His wallet had $1400 in it.

7   Q.      Okay.

8           You were entitled to the cash?

9   A.      Right, but then in the will it says that I was to

10  get $5000 and so we subtracted the $1400 out of the

11  $5000 that I was to get.

12  Q.      All right.

13              MR. MULLINS:  I'm going to take a real

14  quick break and try to expedite this.  Is that all right

15  with you all?  I'm going to go get some copies of these

16  things and I'll have someone bring this back.

17              MR. BRYAN:  That's fine.

18                      *   *   *

19                  (Brief break)

20                      *   *   *

21  BY MR. MULLINS:

22  Q.      As I understand it, you are Elton Wine's

23  daughter; correct?

24  A.      Yes, sir.

JILL D. MYERS v. A.S. TAYLOR, Individually, et al.  6/18/2015  LILLIAN WINE

Page 14

1  A.     A long time, maybe 15 years but they only lived

2  together maybe four of those years.

3  Q.     Do you know anything about your father's criminal

4  history, if he had one?

5  A.     Yes.

6  Q.     Tell me what you know about that.

7  A.     He got caught with marijuana. I was in high

8  school.  On my wedding day he called and said, sorry, he

9  couldn't give me away because he was incarcerated.

10 Q.     He was incarcerated for the marijuana?

11 A.     Yes.

12 Q.     Do you know how long he was incarcerated?

13 A.     Not long at all, like 18 months.

14 Q.     Do you know anything else about any other arrests

15 or convictions that he would have had?

16 A.     He never went to jail but when him and Jill

17 separated there was a domestic.

18 Q.     You don't have any first-hand information about

19 that though; is that right?

20 A.     What do you mean?

21 Q.     You didn't see it, the domestic incident?

22 A.     Not when it happened, no.

23 Q.     Did you see --

24 A.     Her?  He broke her jaw.

JILL D. MYERS v. A.S. TAYLOR, Individually, et al.   6/18/2015   LILLIAN WINE

Page 15

1    Q.      How do you know that?

2    A.      I heard.

3    Q.      Did you ask her that?

4    A.      I didn't ask her, they had a domestic and -- I

5    was at their house and I saw her.

6    Q.      Were you there when the domestic happened?

7    A.      No, I wasn't there at the actual time it happened

8    but I -- she came to live with me after that happened,

9    after her and my dad split up, she came and lived in my

10   house.

11   Q.      For how long?

12   A.      A couple of months.

13   Q.      Kind of transitioning?

14   A.      Yes.

15   Q.      And she had a fractured jaw? Did she have any

16   other injuries that you were aware of?

17   A.      Not that I can recall.

18   Q.      Did she have to have her jaw wired shut or

19   anything like that?

20   A.      No, I don't know that it was actually broken but

21   it was --

22   Q.      Did you know if your father ever had any other

23   domestic situations before that?

24   A.      They never got along and he had several --

JILL D. MYERS v. A.S. TAYLOR, Individually, et al.   6/18/2015   LILLIAN WINE

Page 22

1   A.      When I was at his house.  The neighbor, Judy

2   Nicholson, rented a trailer from my dad, she had called

3   my uncle and told him that there was something going on

4   at my dad's, the cops were there and that we needed to

5   come.

6   Q.      Okay.

7   A.      And so we got there, we got in the car and we

8   went there.  It was only my mom and I.

9   Q.      And that would've been late in the evening; is

10  that right?

11  A.      Yes, I would say 11 o'clock at night.

12  Q.      Charlene's last name is Underwood?

13  A.      Yes.

14  Q.      What's your mom's last name?

15  A.      Fisher.  When we got there the police were still

16  inside the house.

17  Q.      Did you talk to the police?

18  A.      Yes, I signed for his wallet.

19  Q.      Was your mother still inside the house then?

20  A.      They brought him out in a body bag.  They were

21  very rude to me.

22  Q.      Do you know which police officers you talked to?

23  A.      The only one was Waggamon.

24  Q.      Did you know Waggamon or --?

JILL D. MYERS v. A.S. TAYLOR, Individually, et al.   6/18/2015   LILLIAN WINE

Page 23

1  A.    Yeah, that's the name that was on the police

2  report.

3  Q.    Okay.

4       Do you remember talking to any other police

5  officer other than Waggamon?

6  A.    No.

7  Q.    What did you talk about?

8  A.    They unzipped the bag so we could identify him

9  but they would only let me unzip it this much.  They

10 would not let me touch him, they were very -- I was very

11 upset.

12 Q.    Did you ask them what happened?

13 A.    They said that the coroner was -- it looked like

14 he had -- (inaudible).

15 Q.    Did you ask them why they were at your father's

16 house?

17 A.    Yes, they were looking for John Bowman.

18 Q.    Did you ask them what happened inside?

19 A.    After they left I went inside.

20 Q.    Did you ask the police what happened inside?

21 A.    They said he resisted.

22 Q.    Did you have any comment to that?

23 A.    No, my father was 71 years old.  He could not

24 breathe.  He just had had his carotid arteries worked on

JILL D. MYERS v. A.S. TAYLOR, Individually, et al.  6/18/2015  LILLIAN WINE

Page 24

1  and he was complaining that his right arm was numb.  I

2  doubt that he had the strength to really resist.

3  Q.    Did you tell that to the police?

4  A.    That night?

5  Q.    Yes.

6  A.    No.

7  Q.    Did you tell the police you wouldn't be surprised

8  if he resisted?

9  A.    I'm sure if he was asleep on the couch; that he

10  was startled.  I mean they came busting his door down.

11  Q.    But do you know if your father would be -- if he

12  were surprised by the police breaking his door down if

13  he would try to stop them; would you be surprised?

14  A.    From the blood on his pillow, it looks like they

15  did something to him while he was still laying on the

16  couch.

17  Q.    But my question to you is, do you know if your

18  father --

19                        *   *   *

20                      (Sneeze)

21                        *   *   *

22            MR. MULLINS:  Bless you.

23            THE WITNESS:  I don't think so.  He may

24  have.  I may have.  I mean --

JILL D. MYERS v. A.S. TAYLOR, Individually, et al.   6/18/2015   LILLIAN WINE

Page 32

1          Did your dad smoke?

2    A.    Yes.

3    Q.    Do you know what brand he smoked?

4    A.    It didn't matter.

5    Q.    He would smoke anything?

6    A.    Yes.

7    Q.    Did he smoke cigarettes and cigars?

8    A.    He smoked cigarettes and he would ask anyone who

9    visited if they smoked.

10   Q.    And what about cigars?

11   A.    Probably if somebody was visiting and had a

12   cigar, yes.

13   Q.    I'm going to show you a picture which is picture

14   number eight here of an ashtray of different cigarettes

15   and the like in there, do you recognize that ashtray?

16   A.    This was at his house?

17   Q.    Yes, ma'am, that's what I understand.

18   A.    No.

19   Q.    You can give them back to me.  You were at his

20   house with frequency; correct?

21   A.    Yes.

22   Q.    And before he passed away you were there fairly

23   often, right?

24   A.    Right.

JILL D. MYERS v. A.S. TAYLOR, Individually, et al.   6/18/2015   LILLIAN WINE

Page 34

 1   A.      Well, no, they didn't have wheels.

 2   Q.      No, no, no, I'm just talking about the chairs

 3   that they sat on in the mudroom?

 4   A.      Yes.  Okay.

 5   Q.      You said something about your father had had

 6   surgery on his carotid arteries?

 7   A.      Yes.

 8   Q.      Do you know when that was?

 9   A.      Maybe two months --

10   Q.      Do you know where he had that surgery?

11   A.      United Hospital.

12   Q.      In Clarksburg?

13   A.      Yes.

14   Q.      Was that an inpatient surgery?

15   A.      Yes.  It might've been there, I don't know

16   exactly.

17   Q.      Are you familiar with his general health other

18   than that surgery he had on his carotid arteries?

19   A.      He couldn't breathe.

20   Q.      He had COPD?

21   A.      Yes.

22   Q.      And he continued to smoke even though he had

23   COPD; is that right?

24   A.      Yes.

JILL D. MYERS v. A.S. TAYLOR, Individually, et al.   6/18/2015   LILLIAN WINE

Page 40

1  house?

2  A.    Yes.

3  Q.    Did they do any other damage to the house that

4  you're aware of?

5  A.    No, other than the doors being kicked in and the

6  glass, everything was just like ripped apart. I believe

7  personally that there was a large sum of money in my

8  dad's residence.

9  Q.    What do you base that on?

10  A.    I just know how my dad was and my mom would sit

11  in there and help him count it and a neighbor had said

12  that he gave him $10,000 within a couple days of this.

13  Q.    Who's the neighbor that gave him $10,000?

14  A.    My dad had sold a house to Larry Davis for his

15  daughter, Sherry.

16  Q.    And Larry Davis gave him $10,000 in cash?

17  A.    Uh-huh (yes).

18  Q.    Is that a yes?

19  A.    Yes.

20  Q.    And your mother helped him count that money?

21  A.    Yes.

22  Q.    Did your mother tell you how much money she

23  counted?

24  A.    Around $40,000.

JILL D. MYERS v. A.S. TAYLOR, Individually, et al.  6/18/2015  LILLIAN WINE

```
                                                          Page 46

 1    THE STATE OF       :
      WEST VIRGINIA      :
 2                       :   SS:  C E R T I F I C A T E
      COUNTY OF OHIO     :
 3

 4           I, DEBRA A. VOLK, Professional Court
      Reporter, do hereby certify that the testimony given by
 5    the within-named witness, LILLIAN WINE, was by me
      reduced to stenotype in the presence of the witness;
 6    afterwards reduced to Computer Aided Transcription under
      my direction and control; that the foregoing is a true
 7    and correct transcription of the testimony given by said
      witness.
 8

 9           I do further certify that this testimony was
      taken at the time and place in the foregoing caption
10    specified; that the reading and signing was requested
      and was completed without adjournment.
11

12           I do further certify that I am not a
      relative, counsel or attorney of either party, or
13    otherwise interested in the event of this action.

14

15           I do further certify that the attached
      transcript meets the requirements set forth within
16    Article 27, Chapter 47 of the West Virginia Code to the
      best of my ability.

17

18           IN WITNESS THEREOF, I have hereunto set
      my hand in Wheeling, West Virginia, on the 7th day of
19    July, 2015.

20           _____
21           DEBRA A. VOLK,
             Professional Court Reporter
22

23

24
```

# EXHIBIT M

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

3                         AT CLARKSBURG

4

5   JILL D. MYERS, as executrix of   :
    the Estate of ELTON C. WINE,      :
6                   Plaintiff          :
                    v                 :     CIVIL ACTION NO.
7   A.S. TAYLOR, individually,        :     1:14-cv-00156-IMK
    M.S. HORNE, individually,         :
8   J.C. SAURINO, individually,       :
    J. TOMBLYN, individually,         :
9   S.B. HUFFMAN, individually,       :
    M.E. WAGGAMON, individually,      :
10                  Defendants         :

11

12                         *   *   *

13              Deposition of Anthony S. Taylor

14              Tuesday, July 14, 2015

15                         *   *   *

16   a defendant herein, taken on behalf of the plaintiff in

17   the above-entitled cause of action, pursuant to notice

18   and the Federal Rules of Civil Procedure, by and before

19   Connie M. Nichols, Registered Professional Reporter and

20   Notary Public within and for the State of West Virginia,

21   at the law offices of Steptoe & Johnson, PLLC, 400 White

22   Oaks Boulevard, Bridgeport, West Virginia 26330,

23   commencing at 10:40 a.m.

24

Page 9

1    Q.    Okay.

2          Was that a phone call, or how did that occur?

3    A.    At this specific time, I don't recall how it

4    happened.

5    Q.    Okay.

6          Is Sergeant Saurino the team leader?

7    A.    He is.

8    Q.    Okay.

9          So at some point, did you arrive at the

10   Bridgeport detachment for briefing?

11   A.    Yes.

12   Q.    Okay.

13         And what happened once you got there?

14   A.    Once everyone had assembled, we were briefed

15   by Sergeant Saurino that John Bowman was -- we had

16   received a tip that John Bowman was possibly at this

17   residence in Doddridge County, and that John Bowman had

18   a history of explosives and violence with police in the

19   past, and that he was currently on the run for a -- I

20   believe it was a cultivation charge, a drug charge.

21   Q.    So you were told that he was on the run from

22   an arrest warrant for cultivating marijuana?

23   A.    Yes.

24               MR. MULLINS:  Object to form.  That's not

Page 15

1    took some pictures.

2         Q.    Do you remember about how long ago that was?

3         A.    No, sir.

4         Q.    What about like shields?  Do you guys carry

5    any shields?

6         A.    Depending on --

7         Q.    Like ballistic shields?

8         A.    Depending on situation to situation.  For this

9    one, I don't believe that we did.

10        Q.    So what kind of firearms did you have on you?

11        A.    I just carried my department-issued .45

12   caliber.

13        Q.    Did you have any other job, like carrying a

14   hooligan tool or anything like that?

15        A.    The ram.

16        Q.    So your job was to carry the ram?

17        A.    Yes, sir.

18        Q.    And is that the reason that you did not also

19   have a rifle?

20        A.    That's correct.

21        Q.    So following the briefing, you guys loaded up

22   into a van with around 18 guys; is that right?

23        A.    It was crowded.  To tell you how many were

24   there, I couldn't tell you for certain, but it was

Page 18

1    where somebody has died?

2        A.     Nothing I was involved in.

3        Q.     Are you aware of other incidents that you were

4    not involved in where people died?

5        A.     Just secondhand stories where someone had

6    tried to have a shootout.  But I wasn't involved.  That

7    was before my time.

8        Q.     Okay.

9               So what happened once the van that you were in

10   arrived at the target location?

11       A.     We filed out into our stack order and walked

12   into the house under the cover of darkness.

13       Q.     So you stopped somewhere still on the public

14   road?

15       A.     Yes, sir.

16       Q.     No lights or anything like that?

17       A.     No, sir.

18       Q.     And you guys walked down the driveway?

19       A.     Yes, sir.

20       Q.     Again, no flashlights?

21       A.     No, sir.  Nothing that would compromise our

22   approach.

23       Q.     Okay.

24               And what's the first -- what's the first thing

Page 19

1    that happened, that you recall?

2        A.    Well, we parked about 400 yards from where the

3    house was at and made our way down the gravel driveway,

4    and then we encountered some dogs that were barking and

5    a gate.

6        Q.    Were you given any indication that the

7    occupants of the house knew you were there?

8        A.    Just the dogs barking.

9        Q.    Were you walking single file?

10       A.    Once we approach a house, we're not

11   necessarily always single file, but I'd say if you were

12   to classify it, it would probably be close to that.

13       Q.    So you're in a stack?

14       A.    We don't normally stack until we get to the

15   door.

16       Q.    Okay.

17             And your order was what in the stack?

18       A.    I believe I was third from the end.

19       Q.    So you --

20       A.    Third from last.

21       Q.    You would've been right in front of

22   Trooper Horne?

23       A.    That's right.

24       Q.    Do you recall how many were in front of you?

Page 20

1      A.      Exactly, no.

2      Q.      So it's not always a set number.  Depending on

3   where you are, it could be a different guys in front of

4   you?

5      A.      It could depend on the availability of members

6   to get there.

7      Q.      Are you always the -- do you always have the

8   ram, or is that just a sometimes position?

9      A.      At that point in my SRT career, that was my

10  responsibility.

11     Q.      Were you one of the bigger guys?  Is that why

12  you were given the ram?

13     A.      Or the slower, maybe.  I don't know.

14     Q.      Okay.

15             Do you recall whether there were lights on in

16  the house as you approached?

17     A.      I believe that there was some dim lighting

18  inside the house.

19     Q.      Do you recall about what time it was?

20     A.      I think I got to Bridgeport at about 8:30 in

21  the evening.  Now, I don't take anything on an SRT call

22  with me that would compromise me, so a phone or a watch

23  or anything that could get broken usually stays in my

24  car.  It was well after 8:30 because it was at least a

8ef94efd-effa-4af2-90f6-90f4592cc58e

Page 21

1    30-minute, 35-minute, maybe a 40-minute drive there.

2        Q.    So it was completely dark?

3        A.    Yes, sir.

4        Q.    And was it -- well, we know what that one was.

5              As you approached the house, tell me what

6    happened.

7        A.    Well, the dogs started barking at us.  And we

8    came across a fence and a gate, which we had to maneuver

9    around.  And then we made our way to the front door on

10   the porch.

11       Q.    Okay.

12             What happened next?

13       A.    Sergeant Huffman was at point, and I heard him

14   whisper.  And it usually gets passed back through the

15   stack for a breacher, so I made my way to the front door

16   and breached the door.

17       Q.    Did that -- did that tell you that he had

18   tried to unlock the door and that it was locked?

19       A.    That's correct.  I anticipate that command

20   when I'm making my way to the door.

21       Q.    Did you actually see anyone try the door, or

22   are you just assuming?

23       A.    I think I was within range, because I believe

24   there was a storm door.  That's my focus when I get

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 22

1    there, it's to get the team in the house.

2         Q.    Do you think the storm door was locked, or was

3    it the door behind the storm?

4         A.    The door behind the storm door, because I had

5    no -- that was my target.

6         Q.    Okay.

7               So you were called to breach the door?

8         A.    Yes, sir.

9         Q.    And that means hit it with a ram and knock it

10   open forcefully?

11        A.    Yes, sir.

12        Q.    And did you do that?

13        A.    I did.

14        Q.    Prior to you breaching the door, did anyone

15   knock on the door?

16        A.    No, sir.

17        Q.    Prior to you breaching the door, did anyone

18   announce in any way that the state police was there with

19   a search warrant?

20        A.    Not until we broke silence.

21        Q.    And silence was broken by you hitting the door

22   with the ram?

23        A.    Me.  Yes, sir.

24        Q.    Okay.

Page 25

1    knocking or announcing?

2       A.    I'm sorry.  I think I lost track of what you

3    were asking there.

4       Q.    Sure.

5             Do you recall there being any discussion by

6    anyone else there, including and especially

7    Sergeant Saurino or Sergeant Huffman, about whether or

8    not there was any legal requirement to knock and

9    announce -- to knock on the door or announce the state

10   police's presence and that there was a search warrant

11   prior to busting down the door or through the door with

12   the ram?

13      A.    I wasn't privy to that conversation if there

14   was one.

15      Q.    Okay.

16            But it was -- I mean you guys had no lights,

17   right?

18      A.    We had the capability.

19      Q.    Right.

20            But you had walked quietly up the driveway?

21      A.    Yes.

22      Q.    Except for the dogs?

23      A.    Until the dogs.

24      Q.    You were trying not to compromise your

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 26

1    presence; is that right?

2        A.    That's correct.

3        Q.    So you were being quiet on purpose?

4        A.    That's right.

5        Q.    And I know it wasn't your decision to make,

6    but you don't recall hearing any discussions about

7    whether or not you guys should breach through the door

8    first before knocking or announcing?

9        A.    That conversation, if it happened, I wasn't

10   present for.

11       Q.    And, in fact, the practices of the SRT that

12   you had experienced yourself were generally to breach

13   the door first and then announce your presence second?

14                        *   *   *

15             (Officer Waggamon enters the conference

16   room.)

17                        *   *   *

18       A.    My training tells me to do as I'm told.  So

19   this situation, whatever the situation may dictate --

20   it's my responsibility to do my job and not ask too many

21   questions.

22   BY MR. BRYAN:

23       Q.    Right.

24             But as far as what you observed -- you know,

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 29

1    Q.    Did the door break?

2    A.    It was still attached to the hinges.  If

3  memory serves me correct, it was a locking mechanism, a

4  latching mechanism, that broke.

5    Q.    So you open the door, and the team entered?

6    A.    That's right.

7    Q.    Did you enter at that time?

8    A.    After everyone else had entered.

9    Q.    So you entered last?

10    A.    That's right.

11    Q.    So was Sergeant Huffman the first to enter?

12    A.    He was.

13    Q.    Okay.

14         So did he enter immediately after the door

15  busting open?

16    A.    Yes, sir.

17    Q.    Okay.

18         Did he say anything as he entered?

19    A.    He encountered somebody immediately.

20    Q.    So he didn't say anything until he actually

21  encountered somebody?

22    A.    We all announce as we go through the door,

23  "State police!  Search warrant!  State police!  Search

24  warrant!  Get down!  Search warrant!"  Or something to

Page 30

1    that effect.

2         Q.    Okay.

3              Do you recall whether he said that prior to

4    encountering somebody?

5         A.    Oh, yes, that's our practice.  Once we break

6    silence, we announce our presence.

7         Q.    Okay.

8              So as you -- after you busted down the door,

9    you heard the other troopers who were entering the house

10   saying, "State police!  Search warrant!"?

11        A.    Yes, sir.

12        Q.    And they each said it?

13        A.    My focus wasn't on -- that's our training.  My

14   focus wasn't on whether everyone had said it or what

15   they said.  But that's our training, once we break

16   silence, we announce our presence.

17        Q.    Okay.

18              What's the next thing that you recall?

19        A.    I filed in at the rear of the stack.  There

20   was a kitchen that we went into first, and a living room

21   off of that.  And when I went into the kitchen area at

22   the rear of the stack, I was called to a rear bedroom

23   for another breach on a door that was secured.

24        Q.    And did you breach that door?

Page 31

1    A.    I did.

2    Q.    And what did you find inside?

3    A.    A bedroom, but I don't believe it was

4  occupied.  Again, my responsibility is to open the door

5  and get out of the way.

6    Q.    And the suspect, John Bowman, was not found in

7  the house, correct?

8    A.    To my knowledge, no.

9    Q.    And he was not found anywhere on Elton Wine's

10  property?

11    A.    I'm not sure where he was found at eventually,

12  but that night, we did not find anybody.  Let me

13  rephrase that.  We did not find John Bowman that night.

14    Q.    Tell me about what you observed -- when you

15  entered the house, tell me what you observed

16  Sergeant Huffman doing.

17    A.    Through the kitchen, there was an open doorway

18  into a living area, and he was turned facing me where

19  there was a -- I could see a lamp sitting.  And I assume

20  someone was siting there because he had his weapon

21  pointed at that person and was telling them to show him

22  their hands.

23    Q.    Okay.

24          So this would've been his AR-15?

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 35

1    Q.    I mean you knew at that time that you were
2  looking for John Huffman and not Elton Wine?
3    A.    John Bowman.
4    Q.    I'm sorry.
5          John Bowman and not Elton Wine.
6    A.    I knew that's who we were looking for.
7    Q.    In your experience, do you guys always just
8  handcuff occupants of the residences that you're
9  searching?
10   A.    Absolutely.
11   Q.    So in every incidence, you handcuff the
12 occupants of the residence?
13   A.    We'll secure everyone until we can identify
14 that there are no further threats in the house.  That's
15 our common practice.
16   Q.    So Elton Wine was being handcuffed that night
17 regardless of his behavior; is that right?
18   A.    We had no idea what else was beyond us.
19   Q.    I'm not saying that you're wrong for doing
20 that.
21   A.    No.
22   Q.    I just want to make clear that that's your
23 training and that's your policy.
24   A.    It is.

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 36

1      Q.     That's what you've experienced when you're

2   searching a residence and executing a search warrant?

3   Everybody in that residence is getting handcuffs on

4   them; is that right?

5      A.     Yes, sir.

6             MR. MULLINS:  You're talking again about

7   when the SRT is deployed, right?

8   BY MR. BRYAN:

9      Q.     I'm talking about SRT.

10     A.     Right, and I am as well.

11     Q.     Okay.

12            So it appeared to you that Mr. Wine was just

13   sitting on his couch and wasn't complying with the

14   commands that Sergeant Huffman was telling him to do; is

15   that right?

16     A.     At the time that I came in, he was -- "he"

17   being Sergeant Huffman -- he had him and was pulling him

18   to the floor, at which time Mr. Wine was putting his

19   hand underneath of himself and wouldn't surrender his

20   left hand.  So that prompted me to put a muzzle on

21   Mr. Wine, because I had no idea what he was reaching for

22   at that point.

23     Q.     So when you say, "Put a muzzle on Mr. Wine,"

24   that means pointing your weapon?

Page 37

1      A.     Pointing my weapon at him.

2      Q.     And did you not have a rifle, right?

3      A.     No, sir.

4      Q.     Did you already have your pistol drawn?

5      A.     Yes, sir.  Well, I would have it drawn once my

6   responsibility to breach -- and I would be carrying my

7   pistol with one hand and the ram in the other.

8      Q.     So did you ever drop the ram?

9      A.     Eventually.  I put it down once we had

10  everything secured.

11     Q.     So, originally, Sergeant Huffman had his rifle

12  pointed at Mr. Wine.  He took Mr. Wine down off the

13  couch onto the ground, and at that point, it was you

14  that had your gun pointed at Mr. Wine?

15     A.     Yeah, probably more than me.

16     Q.     Do you remember who else was there?

17     A.     At that particular time, I know there were

18  other people there, but regarding who they were, I'm not

19  sure which team members were there.  But I know that we

20  all consider that to be a threat when someone starts to

21  reach and not surrender their hands, especially when

22  they've got a gun pointed at them.

23     Q.     Now, since Mr. Wine was taken down to the

24  ground off the coach, is it possible that he fell onto

Page 38

1   his left arm?

2        A.    It is possible.

3        Q.    And so --

4        A.    But to keep it there and not surrender it when

5   he was given verbal commands to do so was what made me

6   nervous.

7        Q.    So it's possible that his left arm was already

8   under him, but he wasn't bringing it out; is that right?

9        A.    Right.  Because he was being told to put his

10  hands behind his back.

11       Q.    Do you know whether Mr. Wine understood the

12  instructions that were being given to him?

13       A.    I have no idea of his mental capacity or his

14  hearing ability.

15       Q.    So he wasn't -- I mean he wasn't responding,

16  that you recall?  I mean he wasn't communicating?

17       A.    He wasn't complying, is what I would say.

18       Q.    Was he saying anything?

19       A.    Yes.  He was speaking, but what he was saying

20  verbatim I couldn't tell you.  But it wasn't friendly.

21       Q.    But you don't recall specifically what he

22  said?

23       A.    It had some profanity involved in it.

24       Q.    Would it be fair to say that he was surprised

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 39

1   that night?

2              MR. MULLINS:  Object to form.  He doesn't

3   know what he was doing.

4   BY MR. BRYAN:

5       Q.    I mean did he appear to be surprised by the

6   SRT team busting into his house?

7       A.    My observation of him was noncompliance.  It

8   wasn't surprise.  He appeared to be oriented enough to

9   be noncompliant and be belligerent.

10      Q.    He wasn't under arrest that night, was he?

11      A.    No, sir.

12      Q.    He wasn't a suspect that night, was he?

13      A.    For our arrest warrant, he was not our target.

14      Q.    Now, you had a tip that John Bowman may have

15  been at his house, right?

16      A.    I didn't, personally.  That was relayed to me

17  from my team leader, which told the story as to why we

18  were there.

19      Q.    You were never told that there was an arrest

20  warrant for Elton Wine?

21      A.    I was never told that, no.  And I would have

22  been told that if there had been one.

23      Q.    You were never told that there was probable

24  cause to believe that Elton Wine committed any crime?

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 41

1    Q.    And what does -- what effect does that have?

2    A.    I personally never go into a house with the

3  assumption that anyone wouldn't want to harm me.

4    Q.    Well, you told me that part, you know -- for

5  the SRT team, really the primary objective is safety,

6  right?

7    A.    That's correct.

8    Q.    So we're talking officer safety, right?

9    A.    Yes, sir.

10    Q.    And also safety of any other third party or

11  citizen; is that right?

12    A.    That's right.

13    Q.    So that would mean also the safety of Elton

14  Wine, the homeowner in that house; is that right?

15    A.    Yes, sir.

16    Q.    Okay.

17          So he's lying on the ground.  His left hand is

18  not coming out from under him.  And at that time, what

19  did you observe, and what happened next?

20    A.    Sergeant Huffman had to force his hand behind

21  his back to put it into a handcuff.  He had his -- he

22  had control of his right arm because his left was tucked

23  underneath of him, and he had to forcefully pull his arm

24  behind his back to get him secured.

Page 43

1    actually helped Sergeant Huffman.  I don't recall that.

2    I know that when his arm went underneath him, my focus

3    was to make sure he didn't bring something out with that

4    left arm.

5        Q.     Okay.

6               So he may have -- Sergeant Huffman may have

7    been assisted by another trooper there in getting his

8    left arm out, but you don't really recall?

9        A.     I don't recall that.  No, sir.

10       Q.     So your job at that time was just to keep your

11   pistol pointed at Mr. Wine in case that left arm came

12   out with a weapon?

13       A.     Well, I assumed that responsibility.  Yes,

14   sir.

15       Q.     Okay.

16              But in any event, they got his left arm out

17   and handcuffed him?

18       A.     Yes, sir.

19       Q.     What happened next?

20       A.     He was complaining that he couldn't breathe.

21       Q.     Was that immediately after he was handcuffed?

22       A.     It was right in that string of profanities.

23       Q.     To get his left arm out when he was on the

24   ground, did you -- I mean were there any strikes to the

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 44

1  extremities or anything like that?  Any kind of

2  pain-compliance techniques used, that you recall?

3     A.    Not that I recall.

4     Q.    Okay.

5           So he's handcuffed, and he's still on his

6  stomach.  And he starts complaining about not being able

7  to breathe?

8     A.    That's right.

9     Q.    What happened next?

10    A.    He asked for his, I believe, inhaler or his

11 breathing treatment.  It was some of his medication.

12    Q.    Let me ask you this:  Did you ever observe

13 Elton Wine assault or attack Sergeant Huffman?

14    A.    I did not.

15    Q.    Did you ever observe Elton Wine assault or

16 attack any other trooper there?

17    A.    No, sir, I did not.

18    Q.    Did you ever observe Elton Wine grab -- try to

19 grab anybody's firearm?

20    A.    I did not.

21    Q.    Okay.

22          So you said he asks for his inhaler?

23    A.    Breathing treatment.

24    Q.    He asked for his breathing treatment.  At this

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 45

1    point, he's still on his stomach, right?

2        A.    He is.

3        Q.    On the floor of his living room?

4        A.    Yes.

5        Q.    Handcuffed behind his back?

6        A.    Yes, sir.

7        Q.    Did you observe any blood at this time?

8        A.    His left wrist, I believe, is where it was

9    coming from.

10       Q.    His left wrist?

11       A.    Yes, sir.  The one he had tucked underneath of

12   him.

13       Q.    So you did observe blood?

14       A.    Yes, sir.

15       Q.    Do you know how the injury occurred?

16       A.    No, sir.  He had his -- when I came in, he was

17   being taken to the floor.  He tucked his left arm

18   underneath of himself, so whether it was bleeding prior

19   to that or not, it was kind of a fluid motion to the

20   floor.

21       Q.    Do you know whether -- so are you saying that

22   you don't know whether the injury that was bleeding on

23   Mr. Wine was caused by Sergeant Huffman?

24       A.    No, sir, I don't know.

Page 46

1     Q.    Was there broken -- was there like broken

2   glass or broken furniture around?

3     A.    My focus was Mr. Wine, and I don't recall much

4   about the immediate surroundings.  Again, when he put

5   his hand under himself, I focused directly on him.

6     Q.    Was he bleeding as a result of the handcuffs?

7   Do you know?

8     A.    I don't know.

9     Q.    Did you ever look closely at where he was

10  bleeding from, or did you ever examine it?

11    A.    No, sir.  I'd have no reason to do that.

12    Q.    Were you worried about his safety, since he

13  was bleeding?

14    A.    No, sir.  I didn't think it was a

15  life-threatening cut or wound.

16    Q.    So he asked for his breathing treatment.  What

17  happened next?

18    A.    Sergeant Huffman got an inhaler from someone

19  that found it lying somewhere.  Again, my focus was on

20  Mr. Wine.  I remember rolling Mr. Wine up onto his side

21  and Sergeant Huffman trying to give him his inhaler.

22  And he said, "No, that's not it.  That's not what I

23  need.  My nebulizer."

24          So Trooper Horne located the nebulizer in the

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 47

1    kitchen, and Trooper Horne and I got him up and took him

2    in the kitchen and sat him at the kitchen table.

3        Q.    Okay.

4              So you helped him up off the floor?

5        A.    Yes, sir.

6        Q.    Okay.

7              Did he say anything to you?

8        A.    Not anything very nice.

9        Q.    Well, what do you recall him saying?

10       A.    Just swearing at us.  Nothing really

11   significant.  Just swearing.

12       Q.    He was upset?

13       A.    He was upset.

14       Q.    I mean you would agree that it's a traumatic

15   experience for somebody sitting on their couch in their

16   living room and having your team bust down their door

17   and come in with rifles pointed at you; would you not?

18       A.    I would hope I never have to experience that,

19   but I've never sat on the other end of it.

20       Q.    But you've been involved in enough of it, you

21   know, that you would expect, for instance, your

22   71-year-old father to be upset as well if that happened

23   to him, wouldn't you?

24       A.    I wouldn't know how someone would react to it.

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 48

1    I've seen people react different ways.

2        Q.    So he was upset, and you helped take him into

3    the kitchen?

4        A.    That's right.

5        Q.    And what happened once you got in the kitchen?

6        A.    We sat him at the kitchen table in the chair.

7    He was still cuffed behind the back, and we turned on

8    his nebulizer.  And I held the tube in front of his

9    face, and he took a couple breaths off of it.  But

10   still, he was pretty verbally obscene with everything he

11   said.

12       Q.    But you don't specifically recall what words

13   he was saying?

14       A.    Well, it was a lot of "fuck" and

15   "motherfuckers" and things of that nature.

16       Q.    And what were you saying?

17       A.    "Just be quiet and take your treatment."

18       Q.    And he was still handcuffed at this time?

19       A.    He was.

20       Q.    Did you sit him down in a chair?

21       A.    I did.

22            MR. BRYAN:  Where is that photograph that

23   we used?

24

Page 56

1      A.      I did not.  Not until later, once the search

2   was complete.

3      Q.      So the reason that you eventually took the

4   cuffs off was because the search was complete?

5      A.      That's correct.

6      Q.      Did you take the cuffs off?

7      A.      I'm not sure if I took the cuffs off or if

8   Trooper Horne took the cuffs off.  I stayed with

9   Mr. Wine the whole time, and I know Trooper Horne went

10   to go find the key to take the cuffs off.  But who

11   physically removed them -- I know the whole time I was

12   holding that nebulizer up and encouraging him to take

13   his medicine and quit yelling at us.

14      Q.      So the purpose of keeping the occupant of the

15   house handcuffed while the search is going on is for the

16   reason of officer safety, correct?

17      A.      Sure.  We don't want anybody up walking around

18   while we're trying to secure a home.

19      Q.      Okay.

20              At that point while Elton Wine was bleeding

21   and having trouble breathing, he was not handcuffed for

22   his own safety, was he?

23      A.      How exactly do you mean?

24      Q.      Well, he was handcuffed for officer safety,

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 63

1      A.      He did.

2      Q.      Tell me about that.

3      A.      It was after things had -- we had kind of --

4    other than a couple outbuildings, I think the immediate

5    house we had cleared, and he was having trouble

6    breathing.  He was leaning over and became -- well, he

7    quit yelling at me, so he was -- whether he was

8    conscious or not, he was still breathing at that point.

9    And I kept him upright and told Trooper Horne to go get

10   a handcuff key.  And I kept his medicine, his nebulizer

11   tube, in front of his face, so if he -- because that's

12   what I did.  He couldn't reach it.

13          I just kept it in front of him, and he would

14   take a little nip of it once in a while, and put his

15   mouth on it and take a little breath and then go back to

16   screaming at us.  So I kept it in front of him and said,

17   "Come on, Buddy.  Take a breath.  Take your medicine.

18   Sit up here."

19     Q.      As far as Mr. Wine screaming at you and

20   cursing at you, you didn't mention anything about that

21   in the statement that you gave as part of the internal

22   investigation of this matter, did you?

23     A.      (Pause.)

24     Q.      I don't think you did, which is why I asked.

Page 64

1    I'll let you look.

2         A.    If you don't mind.

3               (Witness perusing document.)

4               No, it doesn't look like I mentioned it.

5         Q.    Okay.

6               In your training, you're taught to put all

7    important facts into your statements, correct?

8         A.    That's right.

9         Q.    And that's not something that you included in

10   your statement?

11        A.    No, sir.  It certainly wasn't anything

12   incriminating that he said about where Mr. Bowman was

13   or -- so I chose not to include it.  It was -- and I --

14   like I said, I don't recall him making any specific

15   threats towards me, so ...

16        Q.    So it just indicated to you that this was a

17   man that was upset and emotional?

18        A.    And noncompliant.

19        Q.    Well, I mean he was being compliant at that

20   time, wasn't he?

21        A.    We had -- he was secured at that point.  He

22   was -- actually, I was being more compliant with him by

23   giving him what he asked for.

24        Q.    Well, he was sitting in the chair, right?

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 67

1    group?

2        A.    I did not.

3        Q.    And is the reason for that because the search

4    wasn't complete yet?

5        A.    I'm not sure I had the capability of

6    communicating with anyone outside the house.

7        Q.    Well, somebody did, right?

8        A.    They did.

9        Q.    Do you know who that was?

10       A.    That was Sergeant Curran.

11       Q.    Well, was -- where was Sergeant Curran while

12   this was going on?

13       A.    He had finished his responsibility elsewhere

14   in the house and made his way to the kitchen at one

15   point.

16       Q.    So he was nearby?

17       A.    He was in the house.

18       Q.    Did you ever ask Trooper Curran to call for

19   EMS?

20       A.    I'm not sure if I asked him or if it was just

21   his observation and his capability, because he had his

22   phone with him.  He made the call.  I was there when he

23   made the call.  I don't know if I said, "You need to

24   call 911," or if he just said, "We're clear," because he

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 68

1    had another responsibility.  That would be my other

2    indicator that the house was clear, if other members

3    started finding their way back into other areas.

4         Q.     So when Curran came back in, he observed an

5    unconscious Elton Wine?

6                MR. MULLINS:  Object to form.

7         A.     I can't tell you what he observed when he came

8    back in or whether Mr. Wine was -- I think at that point

9    he had quit yelling at us.  I'm pretty sure of that.

10   But whether he was unconscious or not, he was still

11   breathing.  He was still breathing the whole time I was

12   there.

13   BY MR. BRYAN:

14        Q.     How do you know he was still breathing?

15        A.     I watched his shoulders rise and fall when he

16   took a breath.

17        Q.     But you still thought he might've been faking

18   it?

19        A.     I'm not qualified to do that, but the

20   possibility that he could've been just to get his

21   handcuffs removed so that he could act out -- that

22   possibility existed.

23        Q.     But this isn't -- your fear of Elton Wine

24   faking this and wanting to hurt you -- that wasn't based

Page 72

1   them on a key ring, and anything that could have been

2   lost or, again, damaged or cause harm to me, I usually

3   leave.  Cell phones, watches, rings and things of that

4   nature.  So that was on my key ring, and it's on my key

5   ring today.

6       Q.    So after he was unhandcuffed, what was his

7   condition like?

8       A.    He was -- he wasn't responding to me at that

9   point.  When I was trying to encourage him to breathe

10  and take his medicine, he would take a breath, but he

11  wasn't putting his mouth on his nebulizer at that point.

12      Q.    Did you believe him to be unconscious?

13      A.    Yes.

14      Q.    Was that prior to EMS being called?

15      A.    I'm not sure if that was prior or after.  I'm

16  not sure.

17      Q.    Who else was with you observing this?

18      A.    Sergeant Curran was there because

19  Trooper Horne had left to go get a key.

20      Q.    Was Sergeant Tomblyn there?

21      A.    Eventually, yes, there at last.

22      Q.    So this is prior to Sergeant Tomblyn being

23  there?

24      A.    I believe so.

Page 73

1      Q.      Now, Sergeant Tomblyn was a paramedic.  Do you

2    know that?

3      A.      I've heard him talk about it.

4      Q.      Were you aware of that at this time?

5      A.      Yes, I had heard that he had done that at one

6    point in his career.

7      Q.      Okay.

8              Well, did you ask for his help?

9      A.      He came over and kind of observed and kind of

10   stayed with him and said that the EMS was on the way.

11   He was there with me, but I didn't ask him.  I didn't

12   call for him to come in.  He came in on his own.

13     Q.      At some point, were you talking to Mr. Wine

14   and encouraging him to breathe?

15     A.      Yes.

16     Q.      And was he responding to you?

17     A.      He was breathing, but he wasn't taking his

18   nebulizer.

19     Q.      Do you know whether he could -- I mean whether

20   he was conscious or whether he was able to understand

21   you?

22     A.      He didn't respond to me.

23     Q.      And was that before or after he was

24   unhandcuffed?

Page 76

1    Q.    So he was still sitting in the chair?

2    A.    Yes.

3    Q.    But you were holding him up?

4    A.    I had my hand on his shoulder and was holding

5   his medicine in front of him.

6    Q.    So at some point, you were helping

7   Sergeant Tomblyn monitor Mr. Wine's pulse and breathing.

8   Do you recall that?

9    A.    I recall him doing it, but I'm not a --

10    Q.    Let me show you your statement, Exhibit 2.

11   Down towards the bottom, you discuss assisting

12   Trooper Tomblyn.

13    A.    (Witness perusing document.)

14          This says that I just held him up while

15   Sergeant Tomblyn monitored his pulse and breathing.

16    Q.    Okay.

17          What else does it say?

18    A.    Just that I had -- "Sergeant J. Tomblyn

19   monitored Mr. Wine's pulse and breathing while I held

20   his head up and kept his airway open."

21    Q.    Okay.

22          When that was occurring -- is that an accurate

23   statement?

24    A.    It's verbatim.  It's what's written there.

Page 78

1    arrived, you were with Elton Wine?

2        A.    Yes, sir.

3        Q.    And during the entire time, he was in the

4    chair?

5        A.    Yes, sir.

6        Q.    At no time was he brought down to the ground?

7        A.    Not until EMS got there.

8        Q.    Do you know whether Mr. Wine stopped breathing

9    prior to EMS arriving?

10       A.    He didn't.  He was still breathing when EMS

11   got there.  They were slower breaths, but he was still

12   breathing.

13       Q.    But he was otherwise unconscious?

14       A.    He wasn't responding.  He was unresponsive.

15   That's probably more accurate.

16       Q.    So you guys were holding him up in the chair?

17       A.    Yes, I kept him up so that he didn't slouch

18   over.

19       Q.    At that point, his handcuffs were released?

20       A.    Prior to Doddridge EMS getting there, yes.

21       Q.    Was he still bleeding?

22       A.    I don't recall whether his wrist was still

23   bleeding or not.

24       Q.    Did he ever complain about that to you, that

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 ANTHONY S TAYLOR

Page 91

```
 1   THE STATE OF     :
     WEST VIRGINIA     :
 2                     :  SS:  C E R T I F I C A T E
     COUNTY OF OHIO    :
 3

 4
             I, CONNIE M. NICHOLS, Notary Public within and
 5   for the State of West Virginia, duly commissioned and
     qualified, do hereby certify that the within-named
 6   witness, ANTHONY S. TAYLOR, was by me duly sworn to
     testify to the truth, the whole truth and nothing but
 7   the truth in the cause aforesaid.

 8
             I do further certify that I am not a relative,
 9   counsel or attorney of either party, or otherwise
     interested in the event of this action.
10

11           I further certify that the reading and signing
     of the transcript was requested.
12

13           IN WITNESS THEREOF, I have hereunto set my
     hand and affixed my seal of office at Wheeling,
14   West Virginia, on the 27th day of July 2015.

15

16

17           _____
             CONNIE M. NICHOLS, Notary Pub...
18           within and for the State of
             West Virginia
19

20   My Commission expires:
21   October 16, 2016

22

23

24
```