# EXHIBIT N

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

3                       AT CLARKSBURG

4

5    JILL D. MYERS, as executrix of    :
     the Estate of ELTON C. WINE,      :
6                   Plaintiff          :
                    v                  :    CIVIL ACTION NO.
7    A.S. TAYLOR, individually,        :    1:14-cv-00156-IMK
     M.S. HORNE, individually,         :
8    J.C. SAURINO, individually,       :
     J. TOMBLYN, individually,         :
9    S.B. HUFFMAN, individually,       :
     M.E. WAGGAMON, individually,      :
10                  Defendants         :

11

12                      *   *   *

13             Deposition of Scott B. Huffman

14               Tuesday, July 14, 2015

15                      *   *   *

16   a defendant herein, taken on behalf of the plaintiff in

17   the above-entitled cause of action, pursuant to notice

18   and the Federal Rules of Civil Procedure, by and before

19   Connie M. Nichols, Registered Professional Reporter and

20   Notary Public within and for the State of West Virginia,

21   at the law offices of Steptoe & Johnson, PLLC, 400 White

22   Oaks Boulevard, Bridgeport, West Virginia 26330,

23   commencing at 2:59 p.m.

24

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 4

1                    *   *   *

2                    SCOTT B. HUFFMAN,

3    being first duly sworn, was examined and deposed as

4    follows:

5                    *   *   *

6                E X A M I N A T I O N

7    BY MR. BRYAN:

8        Q.    Please state your name.

9        A.    It's Scott Huffman.

10       Q.    And you are a West Virginia State Trooper?

11       A.    Yes, sir.

12       Q.    And you're a member of the Special Response

13   Team?

14       A.    Yes, sir.

15       Q.    And how long have you been a member?

16       A.    I don't remember what year I came on, but it's

17   between seven and nine years now.

18       Q.    And you are a team leader as well?

19       A.    Yes, sir.

20       Q.    And that's for, I guess, a team separate than

21   what was called out to search at Elton Wine's residence?

22       A.    That's correct.

23       Q.    Where are you usually based out of?

24       A.    The eastern panhandle.  My team's initial

Page 5

1    jurisdiction, we handle calls from Mineral County over

2    through Martinsburg, Jefferson County, that area.

3        Q.    You're stationed in Keyser?

4        A.    Yes, sir.

5        Q.    You were counseled for incorrect handcuffing

6    before; is that right?

7        A.    Yeah, I believe I was.

8        Q.    Do you recall what specifically you did wrong?

9        A.    Yeah.  Actually, I had a young man under

10   arrest for burglary.  I did not put his ankle shackle on

11   him when he was in our office, and the handcuff -- I

12   actually knew the kid, personally, and I didn't tighten

13   the handcuff tight enough.  He's very thin, probably

14   120 pounds.  He was able to slip out of the cuff and run

15   out the front door.

16       Q.    I also saw somewhere else that you -- around

17   December 2010 you were placed on administrative leave,

18   along with some other troopers.  Do you recall why that

19   was?

20       A.    It had to be that we were involved in a

21   shooting for SRT.  I don't remember what year, but it

22   was around that time.  So it had to have been that,

23   because I can't recall any other incident.

24       Q.    Where did that occur?

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 7

1    break the door first or breach the door first prior to

2    announcing that:  Hey, we're state police and we have a

3    search warrant.

4         A.    Yes, sir.

5         Q.    Now, I know that you are -- you are also a

6    team leader.  Is that also your experience, in your

7    practice?

8         A.    Yes, sir.

9         Q.    Are there any instances where you ever knock

10   and announce first, prior to breaching the door?

11        A.    I haven't been a team leader as long, so my

12   answer is going to be no.

13        Q.    Have you ever applied for a warrant or asked

14   another trooper to apply for a warrant that includes

15   permission to perform a no-knock entry?

16        A.    No, sir, I haven't.

17        Q.    So it's also your understanding that you're

18   allowed to perform a no-knock entry whenever you decide

19   that --

20        A.    I believe there are circumstances that allow

21   that or dictate that, or if there's some kind of

22   circumstance where there's a danger, then I believe so.

23        Q.    And that generally has been the default

24   practice?

Page 8

1      A.     Yes, sir.

2      Q.     While you were at the scene that night, at

3   Elton Wine's residence, did you ever have any

4   communications with anyone from the medical examiner's

5   office?

6      A.     Like before or after -- or after, I guess, no,

7   I didn't.

8      Q.     Either before or after?

9      A.     No, sir.

10     Q.     Or during and after?

11     A.     No, sir.  I haven't talked to any emergency

12   personnel.

13     Q.     How did you become -- come to be involved in

14   this entry and search of Elton Wine's house?

15     A.     It's common practice for my team and for

16   Saurino, if we're short members, to call each other,

17   since we're in close proximity.  He had called me that

18   day to ask for additional manpower.

19     Q.     Okay.

20            And at some point were you there at the

21   briefing that took place there at the Bridgeport

22   detachment?

23     A.     Yes, sir.

24     Q.     And what do you recall being briefed on?

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 13

1          So as you approached the house, what was --

2  what was happening?

3     A.    It was a pretty long walk.  Let's just say, we

4  left the main road, walked down the road, made a right

5  into his driveway.  I don't know the distance, but it

6  was a fairly long walk.  When we approached, there

7  was -- I remember there was a fence of some sort that

8  lined outside the fence, and there was a gate opening.

9  I had to partially pass the household a little bit to go

10  in the gate, in the back of the house.  But prior to us

11  even getting to that area, there was a lot of dogs

12  there.  They didn't bite us or anything, but there was a

13  lot of dogs outside.  They were barking, kind of giving

14  away the element of surprise.

15          But I passed that fence up, approached the

16  yard.  They kind of danced around us, but they didn't

17  bite or anything, so we went to the front door.  I went

18  to the front door.

19     Q.    Okay.

20          And what happened when you got to the front

21  door?

22     A.    The screen door was locked, the storm door.  I

23  went to check the door handle.  As I did so, there was

24  an opportunity, with some glass above, to look through

Page 14

1   that to see if I could see anything that might alter

2   our -- our next action.  And I called for a breach.

3        Q.    Did you see anything through the glass?

4        A.    I saw lights on in the living room.  There was

5   an initial room that was dark.  The next room, there was

6   a doorway.  There was a living room and there was lamps

7   on.  And I could see part of a couch, but not all of it.

8   There was a TV on, because I could see the reflection as

9   the screen changes, so there was a reflection off the

10  wall.  But I couldn't see anybody.

11       Q.    Okay.

12             So what happened next?

13       A.    I called for a breach and stepped out of the

14  way from the breached door, and I made entry.

15       Q.    Was it -- was it ever discussed prior to that

16  point, with you or anyone else, whether or not there

17  would be a knock and announce prior to the breach of the

18  door?

19       A.    I can't recall the conversations regarding

20  that beforehand.

21       Q.    So there was no discussion which took place

22  when you approached the door?  I mean if the door was

23  locked, you were breaching it, right?

24       A.    I don't recall.

Page 15

1      Q.      Who made the decision to breach the door?

2      A.      I did.

3      Q.      And the decision was made because the door was

4      locked?

5      A.      Well, that was part of it, yes.

6      Q.      And you never considered knocking on the door?

7      A.      I think that my action might have changed.

8      The reason I looked in the window is -- clearly, we'd

9      been compromised.  There's a ton of dogs outside

10     barking.  They don't bark until we get there.  You know,

11     I want to see if I see a guy inside with a gun.  I want

12     to see if I see someone sitting on the couch.

13             Had I been able to see him, I may have

14     considered knocking first to see what his action is.  If

15     he gets up and comes to the door, I'm going to maintain

16     eyesight of him and watch to see if he comes to the

17     door.  If he takes off running, clearly that's a threat

18     to us.  If he doesn't move, then maybe he's asleep, you

19     know what I mean.

20             But I see no one there, so in my mind for all

21     I know that he has heard the dogs barking.  He might

22     have already looked out the window and seen us.  He

23     might have already retreated in the residence.  So at

24     that point, yeah, I agreed with the decision to breach

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 16

1    the door.  That's why I called for it up.

2              You know, I was calling for the breach, but I

3    could have stopped them at any point.  But, again, when

4    I see no one sitting on the couch and the TV's clearly

5    on, the lights are on, you know, my fear is that someone

6    has already vacated the couch, left -- a gun in the

7    residence, to hide, retrieve a weapon, et cetera.

8        Q.    In fact, Mr. Wine, to your knowledge, was on

9    the couch at that time, wasn't he?

10       A.    That's where I found him when we went in, yes,

11   sir.

12       Q.    And from where he was sitting, you just

13   couldn't see him through the window?

14       A.    Not until I was in through the door and took a

15   couple steps.

16       Q.    Okay.

17             So you called for the breach.  The breacher

18   came and hit the door with the ram?

19       A.    Yes, sir.

20       Q.    Knocked the door open, correct?

21       A.    Yes, sir.

22       Q.    So then you were the first to go through?

23       A.    Yes, sir.

24       Q.    At some point did you announce who you were?

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 17

1    A.    As soon as the door opens, I began announcing.

2    And I continued to do so on my movement through the

3    house.

4    Q.    Okay.

5          And as you started to announce who you were,

6    you were at that time simultaneously stepping through

7    the doorway?

8    A.    Yes, sir.

9    Q.    And what happened after that?

10   A.    My options, I'm either going to go to the left

11   or the right.  The right was the path of least

12   resistance.  There was a room there as I -- toward that.

13   I'm still standing in the head wall, in case someone was

14   going to come in or out.  As I took a couple of steps

15   forward, I saw an arm, shoulder, elbow of someone

16   sitting on the couch.  I had obviously taken a step or

17   two in.  So at that point I've identified there's

18   definitely someone there.  Who it is, I don't know.

19         So instead of going into the room and leaving

20   it, I began to walk straight in that direction,

21   continuing in the same command of: "State police.  Put

22   your hands on your head.  Search warrant."

23   Q.    So as you -- as you saw the individual and you

24   got closer, you said, "State Police, search warrant."

Page 18

1    Is that right?

2        A.    Yes, sir.

3        Q.    And what did you observe?

4        A.    Before I reached the doorway that led into

5    that room, the subject -- who I couldn't see all of --

6    he grabbed something from his lap and pointed it at me,

7    as if it was a pistol.  Again, I couldn't see all of

8    him, but he pointed it in his left hand at me.  I --

9    fortunately, I could see -- there was two clear probes

10   on the front, like what a DISH Network or another remote

11   would have, so I was able to identify that as not being

12   a pistol.  But initially I believed it could be a

13   weapon.

14       Q.    And did you -- I mean you knew what John

15   Bowman looked like from your briefing, correct?

16       A.    I believe I'd seen a picture before I went in.

17       Q.    So how soon was it that you realized that this

18   was not John Bowman?

19       A.    Probably a few minutes later.  I obviously

20   wasn't looking at his face when I was approaching.  But

21   after I had come in and we -- you know, he did actually

22   put the remote down, like I say, as pointing a pistol.

23   He ended up putting it down.  There's periods of where

24   did he comply and didn't.

Page 19

1       But as I was standing there with him, I didn't

2  believe that was John Bowman I was looking at.

3       Q.    Okay.

4       So he's got the remote in his hand.  You come

5  in.  You're pointing your rifle at him.  Correct?

6       A.    Yes, sir.

7       Q.    Did -- did you have your rifle on safe or do

8  you keep it --

9       A.    I keep it on safe until I feel that it's going

10  to be used.  When I saw him and I saw him raise his hand

11  up, my typical practice, just to avoid any accidental

12  discharge, is that at that point I would have put it on

13  fire on a single shot.  Later on, dealing with him, I

14  put it back on safe then.

15      Q.    Okay.

16      So initially was he compliant with you?

17      A.    For -- for a few seconds, yes, sir.

18      Q.    Was it obvious to you that he was surprised?

19      A.    (Pause)

20      Q.    Did you have any indication that he knew that

21  there was a, you know, an SRT team outside his house?

22      A.    I'm not sure that he did.  I don't know.

23      Q.    Did you say anything else to him, like, "Is

24  John Bowman here?"

Page 20

1    A.    Later on I did, yes, sir.

2    Q.    So at this time you just basically told him to

3  keep his hands up or his hands on his head?

4    A.    That was -- and those are commands I'm giving

5  as I'm still approaching him.

6    Q.    And did he do that?

7    A.    Initially, yes, he did.

8    Q.    What happened next?

9    A.    Okay.

10         So I call it a direct threat, because I didn't

11  know who he was at first.  So I went to him and I was,

12  "Put your hands on your head.  Put your hands on your

13  head.  State police."

14         He ends up putting the remote down and does

15  initially put his hands on his head.  As I'm doing that,

16  the team is filtering the house.  They are bypassing me.

17  I'm going to maintain security of him so he does not get

18  up and attack anybody or do anything that would cause

19  anybody harm.

20         As the people are filtering by, someone calls

21  for an internal breach.  When they called for that,

22  between -- between them passing us, I said, "Just stay

23  on the couch.  Keep your hands on your head."

24         They called for an internal breach.  When they

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 21

1    did so, he stood up and tried to get off the couch and

2    go after them.

3        Q.    Okay.

4              Do you have a weapon light on your M4?

5        A.    I do.

6        Q.    And was that activated at all during this

7    time?

8        A.    No, sir.

9        Q.    Okay.

10             So he sees you approach him, and then all

11   these other officers go by you --

12       A.    Yes, sir.

13       Q.    -- to search the rest of the house.  And at

14   some point he stands up?

15       A.    Yes, sir.

16       Q.    Did he say anything?

17       A.    I think he did, something about the rear door.

18   But I don't recall what it was.  I mean he was somewhat

19   belligerent, so I don't know if he was cursing at them

20   or saying, "Don't hit it."  I don't know what it was.

21             I remember him yelling something out, not

22   toward me, but he had turned and faced that direction to

23   walk off and said something.

24       Q.    Was that before or after the rear door was

Page 22

1    breached that he stood up?

2        A.    Oh, no, they had just called for it.  I

3    don't -- I don't think it had been breached.  As soon as

4    he called it, he started to stand up.

5        Q.    So they called for the guy with the ram to

6    come bust another door down; is that correct?

7        A.    Yes, sir.

8        Q.    So he stood up as if in response to that?

9        A.    Yes, sir.

10       Q.    Other than the front door being busted open,

11   was there any other of his property that had been

12   destroyed at that point?

13       A.    Not initially, no.

14       Q.    Did he -- you don't recall what he was saying

15   when he stood up?

16       A.    No, I don't.

17       Q.    Up to that point where he stood up, do you

18   recall anything that he said?

19       A.    I remember him swearing, using the F word a

20   lot.  But most of it was directed toward me like, "What

21   the F are you doing," so on and so forth.

22       Q.    Did he --

23       A.    I'm sorry.

24       Q.    I'm sorry.  Go ahead.

Page 23

1      A.      I was going to say, I just kept saying, "State

2   police.  Keep your hands on your head for me.  Sit down

3   on the couch."

4      Q.      Did he appear to know like why you guys were

5   there?  Or did he say, "Why" --

6      A.      He never mentioned anything about Bowman or

7   anything else.  So I don't know if he knew or not.

8      Q.      Okay.

9              So what happened next, after he stood up?

10     A.      I actually grabbed him by the shoulder, with

11  my left hand, and pushed him back into a seated position

12  on the couch.

13     Q.      Okay.

14             And what happened next?

15     A.      He reached up and grabbed my rifle and tried

16  to pull it away from me.  I kept a grip on his shoulder,

17  to keep him in the seated position, so he couldn't turn

18  one way or the other.  I actually drove my rifle

19  forward, toward the couch, so that the butt was against

20  my chest and the other end was against the couch, so he

21  couldn't pull in any direction.  The coffee table was in

22  my way, and I was kind of extended over that, so I

23  pushed it out of my way also.

24     Q.      At what point did something get broken?

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 24

1    A.    I assume then.  Apparently there was glass on

2    the floor.  I know -- I remember there was a wood floor

3    and a wood coffee table.  I put my right foot on it as I

4    was kind of reaching over and grabbing him.  With my

5    right foot I pushed it back.  Something broke.  I think

6    it must have hit the entertainment stand, but I don't --

7    I don't even remember what broke.  I don't know if it

8    was a glass on the table, the coffee table, something on

9    the table fell off.  I don't know what broke.  But when

10   I pushed it back, it skid across the wood floor and hit

11   something.

12   Q.    Okay.

13         So you held him back down onto the couch.

14   What did you do next?

15   A.    Just more verbal commands.  I was telling him,

16   "You need to let go of my rifle.  You need to let go of

17   my rifle.  Put your hands back on your head."

18         His response was, "Get the F off of me."

19         Which I said, "I'll get off as soon as you let

20   go of my rifle."

21         That exchange happened maybe two or three

22   times or something.  He ended up letting go.  When he

23   did, I backed off also.  I let go and I took a distance

24   between us again.

Page 26

1  make it tight, so it's not swinging around.  And I'm

2  giving him commands.

3          At that point I'm going to place him in -- in

4  handcuffs, to detain him for his safety and for all

5  ours.

6          In this particular scenario, I actually wanted

7  to lay him prone, which I told him, "I want you to lay

8  prone on the floor."

9          Remember, the coffee table had been moved out

10  of the way so there was plenty of room there to do it

11  safely.  And I actually took him by his right wrist and

12  started to pull him forward.  When I tried to do that,

13  again, "I'm going to lay you prone down, face down, and

14  put handcuffs on you."

15          He said, "No," and pulled his hand away from

16  me.

17      Q.    How does -- how does it make Elton Wine safer

18  to handcuff him in his own house?

19      A.    It's his safety and for mine.

20      Q.    I understand you're saying that.  But, really,

21  we're talking about officer safety, right?

22      A.    No, we're talking about his too.

23      Q.    I mean how does that make -- I mean he was

24  fine, sitting on his couch, watching TV before you

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 27

1    busted in.  How is he safer now that he's handcuffed?

2        A.    Because he can't cause any action to make a

3    reaction.  I don't know what's in the couch.  There's

4    bullets on the table that I pushed out of the way.

5    Maybe he has a gun in the couch.  Maybe he has a knife.

6    A 70-year-old can stab or shoot me just as quickly as a

7    20-year-old can.  So I don't know what he has on his

8    person.

9        Q.    So I mean it's for officer safety?

10            MR. MULLINS:  Let him answer his question.

11   You keep interrupting every time he's answering.

12   BY MR. BRYAN:

13       Q.    I'm sorry.  Go ahead.

14       A.    Okay.

15            It's for his safety as well as mine.  Because

16   he may have a weapon on him.  He may have one in the

17   couch.  If he's handcuffed, that's no longer accessible.

18   It's for my safety, you're right.  Because he may pull

19   that and cut me, stab me, shoot someone else in the

20   residence.  But let's say he pulls out a knife and we

21   get in a wrestling match, now I'm involved in a physical

22   altercation with this man.  And I'll use the minimal

23   force necessary to make myself safe.  But at the same

24   time maybe he gets hurt, which he -- by his actions, he

Page 28

1   initiated.

2           So it's for his safety and for mine.  I don't

3   want to get hurt and I don't want to hurt him.  That's

4   not what I'm there for.

5       Q.    The only way that makes him safer is from the

6   SRT team?

7       A.    If you can explain that last one.

8       Q.    I mean there was no concern that he would be

9   injured in some way if he weren't handcuffed, right?

10      A.    Right.  He won't be injured sitting there.

11  You're right.  But how do you know -- as someone coming

12  in the house, how do you know that that person is going

13  to be completely compliant and sit there?

14      Q.    I'm not saying you're wrong about it.  I'm

15  just saying, you know, we all know it's for officer

16  safety, not his safety.

17      A.    No.

18      Q.    But, anyways, I'm not here to argue with you

19  about it.

20          But -- so you -- at some point you go cold.

21  You go to handcuff him.  What happens?

22      A.    Like I said, I actually was going to pull him.

23  I gave him instructions.  He was -- I was going to put

24  him on the floor to handcuff him.  My intention was to

Page 29

1   pull him there, handcuff him, pat down his waistline,

2   make sure he's got no guns, knives, anything in his

3   beltline that he might have access to.

4       Q.     You might want to slow down just a little bit

5   for the court reporter.

6       A.     I'm sorry.

7              He pulled his hand away, so at which point I

8   had to reach out and grab his hand again.  When I did, I

9   grabbed him by the wrist and put a little bit of

10  pressure on it to pull him forward and pull him down to

11  the floor.  Once I was there, I attempted to handcuff

12  him and I gave him verbal commands to put both hands

13  behind his back.  He did resist.  He tried to put his

14  right hand underneath of him again.  He pushed off the

15  floor with his left hand and tried to roll into me.

16             At that point I -- excuse me -- slid my shin

17  across part of his lower back to keep him from being

18  able to turn into me and knock me over.  And I put a --

19  I don't know what it was referred to.  I'm going to

20  refer to it as a key lock, which is just basically an

21  arm hold, some slight pain compliance, and twist his

22  arm, and more verbal commands to place his left hand

23  behind his back.

24      Q.     Was he saying anything at this time?

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 30

1    A.    Just swearing and struggling, that's all.

2    Q.    Do you recall any specific words that he said?

3    A.    Well, profanity.  I don't specifically

4  remember what, though.  Outside of the F word, I don't

5  remember what -- what all he was saying.

6    Q.    And what were you saying to him?

7    A.    Just verbal commands, just simply, "Place your

8  hands behind your back.  Stop resisting.  Place your

9  hands behind your back."

10   Q.    So prior to that, you had taken him from the

11  couch onto the floor?

12   A.    Prior to those commands?

13   Q.    Yeah.  When you decided that you wanted to

14  handcuff him or that you were -- at that time you were

15  going to handcuff him, you physically grabbed him and

16  put him on the floor, from the couch to the floor?

17   A.    Yes, sir.

18   Q.    Did you ever ask him to get on the floor to be

19  handcuffed or to stand up and turn around and be

20  handcuffed?

21   A.    I didn't ask him to stand up, because he'd

22  already been noncompliant.  I had the first time -- I

23  remember there was two times I tried to take him.  The

24  first one was nonaggressive, simply taking his wrist and

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 31

1    pulling him forward toward me and saying, "Lay down on

2    the floor."  And that's when he pulled his arm away and

3    tucked it back.

4            The second time I grabbed ahold of him, I

5    gripped tighter and didn't let go, and I made him lay

6    down on the floor.

7       Q.    Okay.

8            Did you slam him onto the ground?

9       A.    Not at all.

10      Q.    Was there broken glass where --

11      A.    I don't recall.

12      Q.    At some point did he become injured in this

13   altercation?

14      A.    He did.  I didn't know that till later.

15      Q.    Do you know how he got injured?

16      A.    He either cut it on glass or he got cut by my

17   handcuffs, one of the two.  I'm speculating.  I'm not

18   sure.

19      Q.    So he was bleeding from one of his wrists?

20      A.    Yes.

21            And, again, I didn't learn that until later in

22   the evening.

23      Q.    So you didn't see any of the blood?

24      A.    No, I didn't.

Page 32

1     Q.     Have you ever had someone bleed from the wrist

2  before, when you handcuffed them?

3     A.     No, sir.

4     Q.     Have you ever had that happen since?

5     A.     No, sir.

6     Q.     So he's sitting on the couch and you grab

7  ahold of him.  Prior to taking him to the floor, tell me

8  what attempts that you made to handcuff him.

9     A.     I didn't.

10          MR. MULLINS:  Objection.  Asked and

11  answered.

12  BY MR. BRYAN:

13     Q.     You didn't make any attempts?

14     A.     No.  I advised him, "I'm going to lay you on

15  the floor to handcuff you."

16     Q.     Did he say anything?

17     A.     Not at that time, no.

18     Q.     Did he resist being taken down to the floor?

19     A.     Yes, he did.

20     Q.     When you were struggling for his arms or his

21  hands, when he was on his chest, did you strike any of

22  his extremities?

23     A.     No, sir.

24     Q.     Or any part of his body?

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 33

1      A.    No, sir.

2      Q.    Did you do any sort of pain-compliance

3 techniques?

4      A.    Yes, sir.  As I stated, once I was there, he

5 was trying to pull his right arm under.  At that point I

6 took a key lock to bend his arm 90 degrees behind his

7 back, to put some pain upon his shoulder, to hopefully

8 give up his left hand, which was trying to push off the

9 floor and tuck under also.

10      Q.    Do you recall -- was this a big man, Elton

11 Wine?

12      A.    I don't remember.  He was smaller than me.

13 That's about the best I can answer that.

14      Q.    And about what's your size?

15      A.    That was years ago.  I can tell you what I am

16 now.  I don't know what I was then.

17      Q.    What are you now?

18      A.    Probably about 230 now.

19      Q.    About how tall are you?

20      A.    Six foot.

21      Q.    You don't recall what your weight would have

22 been in September of 2012?

23      A.    I've been as low as 200 and up to 240 in the

24 last three years, so --

Page 34

1     Q.     But you don't recall the size of Elton Wine?

2     A.     No, sir.

3     Q.     At some point did you successfully get him

4  handcuffed?

5     A.     Yes, sir.

6     Q.     And what happened next?

7     A.     Just a quick pat down of his waistline, like I

8  stated earlier, to make sure he has nothing in his

9  beltline.  I sat him up.  He advised he had -- he needed

10  something to breathe better, and he had an inhaler on

11  the coffee table -- not coffee table, but end table, on

12  the side of the couch.  Somebody handed that to me, and

13  I administered that to him.  He advised that that wasn't

14  going to be good enough, that he had some kind of oxygen

15  tank in another room.  I turned custody then to two

16  other officers, who I don't recall firsthand, took him

17  into the other room to give him that treatment.

18     Q.     Did he ever strike you?

19     A.     No, sir.

20     Q.     Did he ever attempt to?

21     A.     No.

22     Q.     Did he ever make any threats against you,

23  other than --

24     A.     Nothing that I can recall.

Page 35

1    Q.    -- using profanity?

2    A.    He was just belligerent.  I don't know that he

3    made any threats to cause me harm.

4    Q.    Did you know that that was Elton Wine at this

5    point?

6    A.    I believed it to be, but not for sure.

7    Q.    You -- I'm sorry.  Go ahead.

8    A.    I'm sorry.  I was just saying I had not seen a

9    picture of him, so --

10   Q.    You knew it was not John Bowman?

11   A.    That's correct.

12   Q.    And you knew that there was no arrest warrant

13   for Elton Wine?

14   A.    That's correct.

15   Q.    And he was just being handcuffed because he

16   was the occupant of the house that was being searched?

17   A.    No, it's more of a safety issue.  It's not

18   because he's the occupant or he's the owner.  He's being

19   handcuffed -- everyone is detained, initially, upon our

20   initial entry, until the house is rendered secured and

21   turned over to investigators.

22   Q.    So he was being detained.  He wasn't being

23   arrested, right?

24   A.    That's correct.

Page 37

1      A.    I remember calling for somebody to come take

2  him to the kitchen, so I actually don't know if I stood

3  him up or they did.  I'm not sure.

4      Q.    Was he able to assist in standing himself up

5  or was he pulled up?

6      A.    I don't know.  Because I'm not sure I even

7  stood him up.

8      Q.    So at some point when he was still on his

9  chest, handcuffed behind his back, he complained that he

10 needed his inhaler?

11     A.    He requested it, yes, sir.

12     Q.    Did he say why he needed it?

13     A.    I don't think so.  I think he just said that

14 he needed his inhaler.

15     Q.    Did he say that he was having trouble

16 breathing?

17     A.    I don't think at that time, no.

18     Q.    Okay.

19            So several other officers helped escort him

20 into the kitchen?

21     A.    Yes, sir.

22     Q.    Did you take part in that?

23     A.    No, sir.  I left the same way I entered, to go

24 help search outbuildings.

JILL D. MYERS v. A.S. TAYLOR, INDIVIDUALLY, et al. 7/14/2015 SCOTT B HUFFMAN

Page 48

```
 1   THE STATE OF     :
     WEST VIRGINIA    :
 2                    :   SS:   C E R T I F I C A T E
     COUNTY OF OHIO   :
 3

 4
             I, CONNIE M. NICHOLS, Notary Public within and
 5   for the State of West Virginia, duly commissioned and
     qualified, do hereby certify that the within-named
 6   witness, SCOTT B. HUFFMAN, was by me duly sworn to
     testify to the truth, the whole truth and nothing but
 7   the truth in the cause aforesaid.

 8
             I do further certify that I am not a relative,
 9   counsel or attorney of either party, or otherwise
     interested in the event of this action.
10

11           I further certify that the reading and signing
     of the transcript was requested.
12

13           IN WITNESS THEREOF, I have hereunto set my
     hand and affixed my seal of office at Wheeling,
14   West Virginia, on the 27th day of July 2015.

15

16

17           _____
             CONNIE M. NICHOLS, Notary Public
18           within and for the State of
             West Virginia
19

20
     My Commission expires:
21   October 16, 2016

22

23

24
```