IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JILL D. MYERS, as executrix of the
Estate of ELTON C. WINE,

     Plaintiff,

v.                                CIVIL ACTION NO. 1:14CV156
                                      (Judge Keeley)

A.S. TAYLOR, individually; M.S. HORNE,
individually; J.C. SAURINO, individually;
J. TOMBLYN, individually; S.B. HUFFMAN,
individually; and M.E. WAGGAMON, individually,

     Defendants.

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

## I. INTRODUCTION

Pending before the Court is the defendants' motion in which they seek summary judgment on all counts of the plaintiff's complaint against them. For the reasons that follow, the Court **GRANTS in PART** AND **DENIES in PART** the motion.

## II. BACKGROUND

This case arises from events surrounding the execution of a search warrant at the home of Elton Wine ("Wine") that ultimately ended with Wine's death. As it must, the Court construes the facts in the light most favorable to Myers, the non-movant. See Ussery v. Manfield, 786 F.3d 332, 333 (4th Cir. 2015).

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

## A.    Factual Background

Although the story of this case ends with the death of Wine, it begins with a search for another man, John Bowman ("Bowman"). On September 13, 2012, West Virginia State Police Troopers (the "State police" or "troopers") executed a search warrant on Bowman's property in Marion County, West Virginia (dkt. no. 62 at 2-3), during which they discovered a large marijuana growing operation, including hundreds of live plants, pounds of harvested marijuana ready for sale, and other drug paraphernalia. (Dkt. No. 84-3 at 2).

Bowman was well known to law enforcement authorities, having a long history of violence and criminal arrests. (Dkt. No. 84-3 at 4-5). Previously, he had been arrested for, among other things, multiple malicious assaults, malicious woundings, batteries and domestic batteries, assaults, and also obstruction of a police officer. Id. Bowman also had served time for kidnapping a woman with whom he was having an affair. Id. at 5. Moreover, troopers were aware of rumors that, although never charged, Bowman allegedly may have been involved in the bombing of a local sheriff, for which his brother later was convicted. (Dkt. No. 86 at 5; Dkt. No. 84-3 at 6). Furthermore, Bowman had been previously convicted as a felon in possession of a firearm. (Dkt. No. 86 at 5). During the search

of Bowman's property, troopers found live and spent ammunition, but no firearms, something that led them to believe he might have taken firearms with him. Id.

Based on what they discovered at his property, police obtained an arrest arrant for Bowman, and several officers began the task of locating him. (Dkt. No. 62 at 3). During their investigation, police learned from a neighbor that Bowman might be hiding out in Doddridge County, West Virginia, at the property of his long-time friend, Wine. Id. Consequently, Trooper Mark Waggamon ("Waggamon") was tasked with securing a search warrant for Wine's property. (Dkt. No. 86 at 2). Following up further their lead from Bowman's neighbor, police spoke with the Doddridge County Magistrate Court, which informed them that Wine had previously bonded out Bowman and that the two men were friends. (Dkt. No. 62 at 3).

Meanwhile, troopers spoke with Bowman's former wife, Patty Fetty ("Fetty"), and informed Waggamon that Fetty told them she had listened in on a phone call between one, or both, of Bowman's sons with Wine, during which she overheard Bowman in the background. Id.; Dkt. No. 86 at 2. Fetty denies that she positively identified Bowman, claiming she only heard "someone" talking that she assumed was Bowman. (Dkt. No. 86 at 3).

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

With this information, Waggamon completed a search warrant affidavit and presented it to the Doddridge County Magistrate. Id. at 4-5. Waggamon was familiar with the Magistrate because the two had previously worked together and drove the affidavit to her home, where she signed it in her kitchen. Id. Notably, Waggamon's affidavit did not seek a "no-knock" warrant, nor did it mention any particularized danger the troopers might confront, or the need for a "Special Response Team"[1] ("SRT") to execute the warrant. Id.

The Troopers relayed the information to SRT leader, Sergeant J.C. Saurino ("Saurino"), who gathered his team. (Dkt. No. 84-3 at 8). The team consisted of Trooper J. Tomblyn ("Tomblyn"), Trooper First Class A. S. Tayor ("Taylor"), Trooper First Class M. S. Horne ("Horne"), and Sergeant S. B. Huffman ("Huffman"), among others. (Dkt. No. 84-3 at 6). Waggamon followed the SRT to Wine's residence and parked approximately half a mile down the road while the SRT proceeded to the home. (Dkt. No. 86 at 6).

The SRT stealthily approached the front of the residence. (Dkt. No. 84-3 at 9; Dkt. No. 86 at 7-8). Based on Huffman's

---

[1]There are several regional Special Response Teams within the West Virginia State Police, which are used in potentially dangerous situations, including high-risk arrests and search warrants (Dkt. No. 84-3 at 4). SRT members have advanced special weapons and tactics training. Id.

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

judgment, they proceeded on a no-knock entry; Taylor, who was carrying the necessary device, breached the front door of the home, after which the troopers announced themselves. (Dkt. No. 84-3 at 9-10; Dkt. No. 86 at 8). Huffman was the first to enter, immediately encountering Wine sitting on the couch in the living room holding a television remote control. (Dkt. No. 86 at 8).

Huffman was aware that Wine was not Bowman, but continued to point his rifle at him in order to maintain security while other troopers searched the home. (Dkt. No. 86 at 8). Huffman, who did not know who Wine was, considered him a direct threat and ordered him to place his hands on his head. (Dkt. No. 86 at 8). Initially, Wine complied. (Dkt. No. 86 at 8).

Shortly thereafter, however, another SRT member announced that the troopers intended to breach a locked interior door. (Dkt. No. 86 at 9). When he heard that, Wine attempted to get up off the couch and go towards them while stating something about the door. (Dkt. No. 86 at 9). To prevent Wine from getting up and proceeding towards the other troopers, Huffman claims he pushed aside Wine's coffee table, which caused a glass to fall onto the floor and shatter. (Dkt. No. 86 at 9; Dkt. No. 84-3 at 11). Huffman grabbed Wine by the shoulder and forced him back down onto the couch, at

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

which point, according to Huffman, Wine grabbed the front of his rifle. (Dkt. No. 86 at 9). Wine then said "get the F off me," to which Huffman responded, "as soon as you let go of my rifle" (Dkt. No. at 9). Wine let go of the rifle and the two men separated. (Dkt. No. 8 at 9).

Wine repeatedly asked "what this was about," and denied knowledge of Bowman's whereabouts. (Dkt. No. 86 at 9). At this point, Huffman was concerned that Wine might possibly access a weapon and decided to place Wine in handcuffs "for his safety and our own." (Dkt. No. 86 at 9). Huffman advised Wine that he intended to place him face down on the floor and handcuff him, to which Wine responded by pulling his arm away and proclaiming "no." (Dkt. No. 86 at 9). Huffman proceeded to grab Wine from the couch and place him on the floor. (Dkt. No. 86 at 9). According to Huffman, Wine resisted by pulling his left hand under his body and trying to push up with it. (Dkt. No. 86 at 9). In response, Huffman restrained Wine, placing him in an arm hold, and twisting his arm. (Dkt. No. 86 at 10). During this process, Wine received a cut on his wrist, whether from the glass on the floor or from the handcuffs is not clear. (Dkt. No. 86 at 10).

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

While handcuffed and lying on the floor, Wine began to complain that he was having trouble breathing. (Dkt. No. 86 at 10). Huffman grabbed Wine's inhaler from the end table and administered it to him, but Wine indicated that it would not be enough and stated that he had an oxygen tank in the other room. (Dkt. No. 86 at 10). Huffman turned Wine over to two other SRT members, Horne and Taylor, and began to ask whether anyone had seen Wine's breathing machine. (Dkt. No. 86 at 10). After Trooper Horne located Wine's oxygen nebulizer in the kitchen (dkt. no. 86 at 10), Huffman then led Wine to the kitchen, sat him in a cloth chair, and left him with Horne and Taylor. (Dkt. No. 86 at 10).

Wine asked the troopers to remove his handcuffs but they refused, telling him, "We're not going to remove your cuffs until we clear your house." (Dkt. No. 86 at 11). As Wine sat handcuffed in the chair, Horne turned on the nebulizer and held it to Wine's face. (Dkt. No. 86 at 10). Horne believes that the nebulizer was never properly administered because Wine continued to curse at the officers. (Dkt. No. 86 at 11). Taylor continued to administer the nebulizer, but as soon as he appeared to improve, Wine would return to yelling and cursing at the officers. (Dkt. No. 84-3 at 14-15). At some point, Taylor thought Wine was having trouble breathing

MYERS v. TAYLOR, ET AL.                              1:14CV156

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

because he was cursing less and was hunched over. (Dkt. No. 86 at 11). Stating that they may want to remove Wine's handcuffs and get some help, Taylor left the residence in search of the handcuff key. (Dkt. No. 86 at 11). Wine was still seated and breathing at that time, although he was not talking and appeared unconscious. (Dkt. No. 86 at 11). Taylor returned and uncuffed Wine. (Dkt. No. 86 at 12).

At that point Trooper Tomblyn, a former paramedic, entered the kitchen, while Horne went outside to check on the arrival of EMS, who had been notified. (Dkt. No. 86 at 12). By this time, Wine was not responding and, although still breathing, he would not or could not put his mouth on the nebulizer. (Dkt. No. 86 at 14). Tomblyn held him in the chair until EMS arrived and began attempting to revive Wine. (Dkt. No. 86 at 15). EMS put Wine on the ground and inserted a breathing tube. (Dkt. No. 84-3 at 16). After placing external defibrillator pads on Wine and discovering that he had no pulse, EMS directed Tomblyn to begin chest compressions. (Dkt. No. 84-3 at 16). The revival efforts were in vain; Wine passed away in his kitchen. (Dkt. No. 86 at 15).

After Wine's death, Waggamon secured the home as a crime scene and began taking photographs. (Dkt. No. 86 at 15). He photographed

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

Wine's body, the blood at the scene, the chair Wine was sitting in, and the scene around the couch in the living room (Dkt. No. 86 at 15). It appeared to Waggamon that a struggle had taken place in the living room. (Dkt. No. 86 at 15). Wine's body was sent to the coroner for a post-mortem examination.

Ultimately, the SRT never found Bowman on Wine's property. (Dkt. No. 86 at 15). Later, the next day, Bowman notified the troopers where he was and that he intended to turn himself in to them.

**B.    Procedural Background**

On September 12, 2014, Wine's former wife, Jill Myers ("Myers"), in her capacity as the executrix of his estate, filed a complaint against Horne, Huffman, Saurino, Taylor, Tomblyn, and Waggamon individually. Her complaint asserts four causes of action: (1) excessive force under 42 U.S.C. § 1983 in violation of the Fourth Amendment; (2) bystander liability pursuant to 42 U.S.C. § 1983 under Randall v. Prince George's County, Md., 302 F.3d 188 (4th Cir. 2002); (3) unreasonable search and seizure in violation of the Fourth Amendment; and (4) wrongful death. The complaint does not state which counts pertain to each defendant or whether all counts apply to all defendants.

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

Following discovery, the defendants moved for summary judgment on all counts of Myers's complaint. At the final pre-trial conference on November 3, 2015, the Court heard oral argument from the parties on this motion and for the reasons that follow made the rulings discussed below.

### III. LEGAL STANDARD

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a), (c)(1)(A). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. <u>Providence Square Assocs., L.L.C. v. G.D.F., Inc.</u>, 211 F.3d 846, 850 (4th Cir.2000). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

nonexistence of genuine issues of fact. <u>Celotex Corp. v. Catrett</u>,

477 U.S. 317, 323 (1986). Once the moving party has made the

necessary showing, the nonmoving party "must set forth specific

facts showing that there is a genuine issue for trial." <u>Anderson</u>,

477 U.S. at 256 (internal quotation marks and citation omitted).

The "mere existence of a scintilla of evidence" favoring the

nonmoving party will not prevent the entry of summary judgment; the

evidence must be such that a rational trier of fact could

reasonably find for the nonmoving party. <u>Id.</u> at 248–52.

## IV. APPLICABLE LAW

### A.   42 U.S.C. § 1983 Claims

The plaintiff's claims all stem inexorably from alleged

violations of 42 U.S.C. § 1983, which provides that:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory
> or the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress, except that in any action
> brought against a judicial officer for an act or omission
> taken in such officer's judicial capacity, injunctive
> relief shall not be granted unless a declaratory decree
> was violated or declaratory relief was unavailable. For
> the purposes of this section, any Act of Congress
> applicable exclusively to the District of Columbia shall

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

be considered to be a statute of the District of Columbia.

To succeed on a § 1983 claim, a plaintiff must show that (1) they were deprived of a right "secured by the Constitution and the laws" of the United States, and (2) the individual who deprived them of the right was acting under color of state law. <u>Lugar v. Edmonson Oil Co.</u>, 457 U.S. 922, 930 (1982) (internal citations omitted). Generally, a public employee acts under color of law "while acting in his official capacity or while exercising his responsibilities pursuant to state law." <u>Conner v. Donnelly</u>, 42 F.3d 220, 223 (4th Cir. 1994) (quoting <u>West v. Atkins</u>, 487 U.S. 42, 50 (1988)).

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" <u>Graham v. Connor</u>, 490 U.S. 386, at 393-94 (1989) (quoting <u>Baker v. McCollan</u>, 443 U.S. 137, 144, n. 3 (1979)). In order to determine what standard applies, courts must first isolate "the specific constitutional right allegedly infringed." <u>Baker</u>, 443 U.S. at 140. Generally, the Fourth and Eighth Amendments provide the "two primary sources of constitutional protection against physically abusive governmental conduct." <u>Graham</u>, 490 U.S. at 394.

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against <u>unreasonable</u> searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. (emphasis added). It is from the clear language of the Fourth Amendment that courts derive the standard applicable to alleged violations of it. <u>See</u> <u>Graham</u>, 490 U.S. at 394-95. Accordingly, courts must look at conduct that allegedly violates the Fourth Amendment and determine "whether the officers' actions are '<u>objectively reasonable</u>' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Id.</u> at 397 (emphasis added) (citing <u>Scott v. United States</u>, 436 U.S. 128, 137–39; <u>Terry v. Ohio</u>, 392 U.S. 1, 21 1968) (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard")).

### B.    Qualified Immunity

Defendants assert a defense of qualified immunity as to all of Myers's claims. Under the qualified immunity defense, individual officials performing discretionary functions are immune from liability for civil damages insofar as their conduct does not violate "clearly established statutory or constitutional rights of

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Covey v. Assessor of Ohio Cty.</u>, 777 F.3d 186, 195 (4th Cir. 2015). The qualified immunity doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009).

"Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." <u>Willingham v. Crooke</u>, 412 F.3d 553, 558-59 (4th Cir. 2005) (internal quotations omitted). "Ordinarily, the question of qualified immunity should be decided at the summary judgment stage." <u>Id.</u> at 558-59 (citations omitted). Moreover, "[a]t the summary judgment stage, once we have viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law." <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (citing <u>Scott</u>, 550 U.S. at 381, n. 8).

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful."

14

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

<u>Henry</u>, 652 F.3d at 531 (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 206 (2001), <u>overruled in part</u>, <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009)). For a right to be clearly established, "every 'reasonable official would have understood that what he is doing violates that right.'" <u>West v. Murphy</u>, 771 F.3d 209, 213 (4th Cir. 2014) (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 131 S.Ct. 2074, 2083 (2011)). A clearly established right, however, "need not be one with respect to which all judges on all courts agree." <u>Owens v. Baltimore City State's Att'y Office</u>, 767 F.3d 379, 395 (4th Cir. 2014).

"The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Hunter v. Bryant</u>, 502 U.S. 224, 229 (1991) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)). Society forgives officers for reasonable errors because "'officials should not err always on the side of caution' for fear of being sued." <u>Id.</u> (quoting <u>Davis v. Scherer</u>, 468 U.S. 183, 195 (1984)).

Finally, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" <u>Pearson</u>, 555 U.S. at 231 (quoting <u>Groh v. Ramirez</u>,

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). Indeed, "[q]ualified immunity is meant to protect against liability for 'bad guesses in gray areas.'" Bellotte v. Edwards, 629 F.3d 415, 424 (4th Cir. 2011) (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)).

In Saucier v. Katz, the United States Supreme Court laid out a two-step sequential analysis courts should apply when determining whether an official is entitled to qualified immunity. 533 U.S. 194, 200-01 (2001). The first question is whether the alleged facts, taken in the light most favorable to the injured party, show that the conduct violated a constitutional right. Id. at 201. The second question is "whether the right was clearly established." Id. at 201. In 2009, the United States Supreme Court overruled the sequential aspect of Saucier, finding it unnecessarily rigid and holding that:

> The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

<u>Pearson</u>, 555 U.S. at 236. Accordingly, courts have discretion to determine which prong should be addressed first, but if either prong is met, a defendant is entitled to summary judgment. <u>Id.</u>

### V. DISCUSSION

#### A.    Count One - Excessive Force

In her response to defendants' motion for summary judgment, Myers concedes that Trooper Huffman was "the only officer to apply physical force to Mr. Wine that night." (Dkt. No. 86 at 21). Accordingly, the Court **FINDS** that the remaining defendant troopers cannot be liable for use of excessive force as alleged in Count One of Myers's complaint, and **GRANTS** defendant's motion for summary judgment as to Troopers Horne, Saurino, Taylor, Tomblyn, and Waggamon. The question remains, however, as to whether Trooper Huffman is entitled to qualified immunity on the claim that he used excessive force when he restrained Wine with handcuffs.

Courts must analyze excessive force claims using the Fourth Amendment "'reasonableness' standard, rather than under a 'substantive due process' standard." <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the

17

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

intrusion on the individual's Fourth Amendment interests against

the countervailing governmental interests at stake." Id. at 396

(internal quotations and citations omitted).

　　"The 'reasonableness' of a particular use of force must be

judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight." Id. at  396

(citation omitted). Furthermore, Graham noted that:

> Because '[t]he test of reasonableness under the Fourth
> Amendment is not capable of precise definition or
> mechanical application,' however, its proper application
> requires careful attention to the facts and circumstances
> of each particular case, including the severity of the
> crime at issue, whether the suspect poses an immediate
> threat to the safety of the officers or others, and
> whether he is actively resisting arrest or attempting to
> evade arrest by flight.

Id. at 396 (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)).

　　Finally, Graham laid out factors that lower courts should

consider in determining whether officers used excessive force:

> Considerations such as the following may bear on the
> reasonableness or unreasonableness of the force used: [1]
> the relationship between the need for the use of force
> and the amount of force used; [2] the extent of the
> plaintiff's injury; [3] any effort made by the officer to
> temper or to limit the amount of force; [4] the severity
> of the security problem at issue; [5] the threat
> reasonably perceived by the officer; and [6] whether the
> plaintiff was actively resisting. We do not consider this
> list to be exclusive. We mention these factors only to
> illustrate the types of objective circumstances

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

> potentially relevant to a determination of excessive force.

Graham, 490 U.S. at 396. These points of consideration have become known as the Graham factors. See also Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015) (listing the Graham factors and noting that they are not exclusive).

Here, Myers alleges that Huffman "engaged in inflicting violent physical force against [] Wine, causing blunt force trauma, blood loss, pain, and restriction of mobility . . . ." (Dkt. No. 62 at 8). Huffman, on the other hand, claims that his action in seizing Wine was objectively reasonable because, under Supreme Court precedent, the Fourth Circuit allows him to reasonably detain occupants during a lawful search, including using reasonable force to effectuate the detention. See e.g. Bailey v. United States, 133 S. Ct. 1031, 1038 (2013) (noting that detention is appropriate to secure the scene and prevent flight); Michigan v. Summers, 452 U.S. 692, 702–03 (1981)(noting that "the risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation"); Yanez-Marquez v. Lynch, 789 F.3d 434, 471 (4th Cir. 2015) ("[L]aw enforcement officers, when executing a search, may take reasonable action to secure the

MYERS v. TAYLOR, ET AL.                                    1:14CV156

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

premises and to ensure their own safety and the efficacy of the search.").

Indeed, at oral argument, plaintiff conceded that clearly established law provides a law enforcement officer with the right to detain, and handcuff when necessary, occupants of a home in which a lawful warrant is being executed. Plaintiff contends, however, that material questions of fact are disputed as to whether the handcuffing of Wine was warranted and reasonable, inasmuch as the troopers knew Wine was not Bowman. More importantly, the plaintiff contends that the methods, manner, and amount of force used to handcuff Wine, a 71 -year-old man, were excessive.

The evidence presented and the parties' oral argument established that disputed questions of material fact exist as to the plaintiff's excessive force claim. Among others, these include: 1) why and exactly when Huffman decided he needed to handcuff Wine; 2) whether Wine was reasonably given an adequate opportunity to comply before force was applied; 3) whether Wine was actively resisting; 4) whether Huffman was unreasonably violent in his handling of Wine; and 5) what safety risks did Huffman reasonably perceive.

Accordingly, finding that disputed questions of material fact exist that prevent summary judgment or a finding of qualified immunity as a matter of law at this stage, the Court **DENIES** defendants' motion for summary judgment on Count One of Myers's complaint as it pertains to Trooper Huffman.

**B.   Count Two - Bystander Liability on the Excessive Force Claim**

Myers claims that other troopers besides Huffman should be held liable for Wine's injuries and death because they have "an affirmative duty to intervene when another officer is violating a citizen's constitutional rights," and they failed to do so here. See Browning v. Snead, 886 F. Supp. 547, 552 (S.D. W. Va. 1995) ("A police officer may not stand by idly while a citizen's constitutional rights are violated by another officer; he has an affirmative duty to intercede on the citizen's behalf.").

The Fourth Circuit Court of Appeals has held that "an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Randall v. Prince George's County, Md., 302 F.3d 188, 204 (4th Cir. 2002). Further, the court noted that "[i]f the bystander lacks such specific knowledge, he

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible. Id. at 204, n. 24.

Notably, the level of specific knowledge of a bystander is high. Indeed, in Randall, officers clearly knew that "(1) some of the Appellees were present at the CID Station, and that (2) individuals were being detained there against their will."[2] Id. at 205. Nonetheless, the court declined to assess liability because the evidence failed to show that the officers "also knew that these two groups (i.e., the Appellees and the persons being involuntarily detained) were one and the same." Id.

Here, however, neither evidence presented by the plaintiff, nor oral argument, have pointed the Court to facts sufficient to support a finding that Troopers Horne, Taylor, Tomblyn, and Waggamon are liable under the theory of bystander liability. There is nothing in Myers's complaint, her response to defendants' motion for summary judgment, or oral argument that established even an

---

[2]The court further opined that:
> Although either [Officer] Swope or [Officer] Ricker knew that Plaintiffs Mayhew, Mobley, and Swint were present at the CID Station, and also knew that there was no probable cause for any of them to be detained, there is no evidence that either Swope or Ricker knew that any of them was being held involuntarily.

Id. at 205.

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

inference that any of these troopers had specific knowledge that Wine's rights were being violated yet failed to act when they could do so.

In addition, there is no scenario under which Huffman is liable as a bystander. The parties agree that Huffman was the only person to apply any force to Wine that evening. If he is found liable for personally using excessive force, he cannot simultaneously be a bystander. Conversely, should he not be liable, then there is no violation to which he could be a bystander.

As a consequence, the Court **GRANTED** defendants' motion for summary judgment on Count Two (Bystander Liability as to the excessive force claim) of Myers's complaint as it pertains to Troopers Horne, Huffman, Taylor, Tomblyn, and Waggamon.

**C.    Count Three - Unreasonable Search and Seizure**

Myers alleges that the troopers violated Wine's Fourth Amendment right to be free from unreasonable searches and seizures by executing a no-knock entry without a warrant specifically authorizing such, and in the absence of sufficient exigent circumstances. During oral argument, it became apparent that the plaintiff had no evidence that Troopers Horne, Taylor, Tomblyn, and Waggamon provided any input that produced the decision to execute

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

a no-knock entry. Indeed, there is no evidence that Horne, Taylor, and Tomblyn ever saw the warrant or knew the contours of the search authorized. As part of the SRT stack, those troopers were following orders based not on their own understanding of the circumstances, but rather on their reliance on Saurino's and Huffman's knowledge and judgment. As a consequence, the Court **GRANTED** the defendants' motion for summary judgment on Count Three of Myers's complaint as it pertains to Troopers Horne, Taylor, Tomblyn, and Waggamon.

It is axiomatic that, prior to "forcibly entering a residence, police officers 'must knock on the door and announce their identity and purpose.'" <u>Bellotte v. Edwards</u>, 629 F.3d 415, 419 (4th Cir. 2011) (quoting <u>Richards v. Wisconsin</u>, 520 U.S. 385, 387 (1997). However, the law makes clear that no-knock entries, although generally disfavored, are allowed in the presence of exigent circumstances. "Though the 'knock and announce principle forms a part of the Fourth Amendment reasonableness inquiry,' no-knock entries may still be reasonable by virtue of exigent circumstances." <u>Id.</u> at 419-20 (quoting <u>Wilson v. Arkansas</u>, 514 U.S. 927, 930 (1995); <u>see also</u> <u>United States v. Kennedy</u>, 32 F.3d 876, 882 (4th Cir. 1994).

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

"In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Bellotte, 629 F.3d at 420; see also Hudson v. Michigan, 547 U.S. 586, 590 (2006) ("We require only that police have a reasonable suspicion . . . under the particular circumstances . . . ." (citations omitted) (emphasis added)). The Fourth Circuit caselaw requires a "particularized basis for any suspicion that would justify a no-knock entry." Id. (citing United States v. Dunnock, 295 F.3d 431, 434 (4th Cir. 2002)). "Generic" dangers and threats "raised at the most general level" are not particularized enough to establish exigent circumstances. Bellotte, 629 F.3d at 424 n. 2) (agreeing with that portion of the dissenting opinion); see also Allen v. Gillenwater, 2012 WL 3475583, at *8 (M.D.N.C. 2012) (quoting Belotte). "Where 'neither the prospect of injury nor any other emergency gave the officers a plausible reason to neglect what the Constitution ordinarily demands, entry into a home based on 'speculation' is not reasonable under the Fourth Amendment." Allen, 2012 WL 3475583, at *8 (quoting Bellotte, 629 F.3d at 423).

## MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]

The evidence presented in the briefs and during oral argument establishes that there are disputed questions of material fact as to the constitutionality of Huffman and Saurino's decision to utilize a no-knock entry of Wine's home. Among others, these include: 1) when and under what information was the decision to make a no-knock entry made; 2) what specific knowledge Saurino and Huffman had prior to and at the moment of deciding to breach; 3) what were the exact exigent circumstances, who knew them, and when; 4) were those circumstances sufficient to justify the no-knock entry; and 5) whether there was a predetermined decision that a no-knock entry was going to be executed regardless of whether sufficient exigent circumstances were present.

Accordingly, because disputed questions of material fact exist that preclude summary judgment or a finding of qualified immunity as a matter of law as to Huffman and Saurino, the Court **DENIES** defendants' motion for summary judgment on Count Three as to them.

### D. Count Two - Bystander Liability on the No-Knock Entry Claim

Under the theory of bystander liability, Myers claims that other troopers in the stack should be held liable for the decision by Huffman and Saurino to execute the no-knock entry. (See supra Part V.B.). Here, it is undisputed that, in the moments just before

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

the physical breach, it was Huffman who made the decision to conduct a no-knock entry based on his subjective belief that exigent circumstances existed. Accordingly, he cannot be liable as a bystander to a violation he allegedly committed.

Furthermore, as with Myers's claim for bystander liability on her excessive force claim, neither evidence presented by the plaintiff, nor her oral argument, have pointed the Court to facts sufficient to support a finding that Troopers Horne, Saurino, Taylor, Tomblyn, and Waggamon are liable. There is nothing in Myers's complaint, her response to defendants' motion for summary judgment, or offered at oral argument that established even an inference that any of these troopers had any specific knowledge that Wine's rights were being violated, yet failed to act when the could do so.

As a consequence, the Court **GRANTS** defendants' motion for summary judgment on Count Two (Bystander Liability as to the no-knock entry claim) of Myers's complaint as it pertains to all defendants.

**E.   Count Four - Wrongful Death**

Because the Court has granted summary judgment on Counts One, Two, and Three of Myers's complaint as they pertain to Troopers

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

Horne, Taylor, Tomblyn, and Waggamon, they cannot be held liable for Wine's alleged wrongful death. Accordingly, the Court **GRANTS** summary judgment as to those defendants, and **DISMISSES** the claims in Count Four as to Troopers Horne, Taylor, Tomblyn, and Waggamon.

Based on the discussions at oral argument, the Court has determined that there are disputed material facts that preclude summary judgment or a finding of qualified immunity as a matter of law as to Trooper Huffman on Count One and Troopers Huffman and Saurino on Count Three. Thus, the question of their liability, if any, for Wine's wrongful death remains in dispute; should the plaintiff establish that Wine died as a proximate result of a constitutional violation of Wine's Fourth Amendment rights, they may be held liable under West Virginia law for Wine's wrongful death, unless they are qualifiedly immune for those actions. Consequently, the Court **DENIES** the plaintiff's motion for summary judgment on Count Four as to Troopers Huffman and Saurino.

### SUMMARY OF THE COURT'S RULINGS

In summary, for the reasons discussed, the Court:

1.  **GRANTED** defendants' motion for summary judgment on **ALL COUNTS** of plaintiff's complaint as they pertain to Troopers Horne,

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

Taylor, Tomblyn, and Waggamon, and **DISMISSES WITH PREJUDICE** those defendants from this case;

2. **GRANTED** defendants' motion for summary judgment on Count One [Excessive Force] of plaintiff's complaint as it pertains to Trooper Saurino and **DISMISSED WITH PREJUDICE** the constitutional claim of a Fourth Amendment violation against him in Count One; and

3. **GRANTED** defendants' motion for summary judgment on Count Two [Bystander Liability] of plaintiff's complaint as it pertains to Troopers Huffman and Saurino and **DISMISSED** that claim **WITH PREJUDICE**.

## SUMMARY OF REMAINING CLAIMS

The following claims remain for trial:

1. Count One - Plaintiff's claim of excessive force in the restraint and handcuffing of Wine as it pertains to Trooper Huffman and his defense of qualified immunity;

2. Count Three - Plaintiff's claim of a Fourth Amendment violation for a no-knock entry as it pertains to Troopers Huffman and Saurino, and their defense of qualified immunity; and

**MEMORANDUM ORDER AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 79]**

3.   Count Four – Plaintiff's claim for wrongful death as it pertains to Troopers Huffman and Saurino.

It is so **ORDERED**.

The Court directs the Clerk to transmit copies of this Order to counsel of record.

DATED: December 4, 2015.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE